[No. B199993. Second Dist., Div. Four. Dec. 27, 2007.]

DOMINICK RUBALCAVA et al., Plaintiffs and Respondents, v.
FRANK MARTINEZ, as City Clerk, etc., et al., Defendants and Appellants;
UNITE HERE LOCAL 11, Real Party in Interest and Appellant.

**COUNSEL**

Rockard J. Delgadillo, City Attorney, Valerie L. Flores and Harit U. Trivedi, Deputy City Attorneys, for Defendants and Appellants.

Davis, Cowell & Bowe, Richard G. McCracken, Andrew Kahn and Paul More for Real Party in Interest and Appellant.

Bell, McAndrews & Hiltachk, Thomas W. Hiltachk, Brian T. Hildreth and Paul T. Gough for Plaintiffs and Respondents.

**OPINION**

**MANELLA, J.**—Respondents sought mandamus and injunctive relief against appellant City Council of Los Angeles (City Council) and other parties, contending that the City Council improperly approved an ordinance essentially similar to one that the City Council had repealed following respondents' successful campaign to institute a referendum on it. The trial court granted respondents' petition. We reverse.

## RELEVANT FACTUAL AND PROCEDURAL HISTORY

On November 22, 2006, the City Council adopted ordinance No. 178082, entitled "Hotel Worker Living Wage Ordinance" (Wage Ordinance).[1] The ordinance set minimum wage standards that exceeded California's minimum wage requirements for certain hotel workers employed within the Gateway to Los Angeles (Century Corridor) Property Business Improvement District (PBID), which abuts Los Angeles International Airport. Under the ordinance, hotels within the PBID that contained 50 or more guest rooms were obliged to pay at least $9.39 per hour to workers who received health benefits, and at least $10.64 per hour to workers who did not receive health benefits.

The Wage Ordinance was opposed by respondents—who are a group of hotel operators within the PBID and individual taxpayers—and other parties, including the Los Angeles Chamber of Commerce (Chamber of Commerce).[2] Whereas respondents objected to the imposition of special minimum wage requirements on a relatively small number of hotels, the Chamber of Commerce's primary concern was that similar requirements would eventually be imposed on other businesses. On December 29, 2006, respondents submitted a referendum petition against the Wage Ordinance containing 103,000 signatures. On January 10, 2007, appellant Frank Martinez, the city clerk of the City of Los Angeles, certified that the petition satisfied the requirements of the Los Angeles City Charter. This certification obliged the City Council to submit the Wage Ordinance to a popular vote or repeal it. Throughout the remainder of January 2007, members of the City Council and other city

---

[1] The text of the Wage Ordinance (No. 178082) is contained in appendix A.

[2] Respondents are Dominick Rubalcava, Dorena Knepper, Teri Bialosky, Joseph Czyzyk, Sunstone OP Properties L.L.C. (doing business as Courtyard by Marriott—LAX/Century Blvd.), BA LAX L.L.C. (doing business as Embassy Suites Hotel LAX North), Fortuna Enterprises, L.P. (doing business as Los Angeles Airport Hilton), HST Lessee LAX L.P. (doing business as The Westin Los Angeles Hotel), LAX Airport Hospitality, L.L.C. (doing business as Holiday Inn LAX), LQ Management, L.L.C. (doing business as La Quinta Inn & Suites, LAX), and LAX Hospitality L.P. (doing business as Radisson Hotel LAX).

officials met with opponents of the ordinance and other interested parties in an effort to devise a new ordinance that would resolve the opposition to the Wage Ordinance.

On January 31, 2007, the City Council repealed the Wage Ordinance. On February 21, 2007, it approved ordinance No. 178432, entitled "Airport Hospitality Enhancement Zone Ordinance" (Zone Ordinance).[3] The ordinance designated the area bounded by the PBID as a hospitality enhancement zone, and committed the City of Los Angeles (City) to make a number of improvements within the zone. The City declared that it would perform $1 million in street improvements, conduct a $50,000 study into ways of attracting new businesses, and create a program that would train 120 workers per year for positions in hotels and restaurants; in addition, it promised to investigate a reduction in business taxes, the creation of a new recycling and waste diversion program, and the construction of a convention center and remote hotel check-in facilities.

The Zone Ordinance also set minimum wage requirements for hotel workers identical to those found in the Wage Ordinance, but mandated their implementation by phases, and delayed full implementation until January 1, 2008. In addition, the Zone Ordinance permitted a hotel to avoid the wage requirements if it showed that the requirements were significantly burden-some or that its workers had agreed in a collective bargaining agreement to waive the requirements. The ordinance contained a commitment from the City that it would not impose wage requirements on other businesses absent further study.

On February 28, 2007, respondents filed their petition for mandamus and injunctive relief against the City Council, Frank Martinez, in his official capacity as city clerk of the City of Los Angeles, and Rockard J. Delgadillo, in his official capacity as City Attorney of the City of Los Angeles. The petition contended that the City Council's conduct in connection with the Zone Ordinance contravened their rights regarding referenda and initiatives under the California Constitution. It also sought an injunction to prevent Martinez from giving effect to the Zone Ordinance by publishing it.[4] On February 28, 2007, Judge Dzintra Janavs issued an alternative writ of mandate and order to show cause, and directed Martinez to refrain from publishing the zone ordinance. Judge Janavs subsequently permitted appellant Unite Here Local 11 (Local 11) to intervene in the action. After Local 11 exercised a peremptory challenge to Judge Janavs, the action was transferred

---

[3] The text of the Zone Ordinance (No. 178432) is contained in appendix B.

[4] Under the City's charter, an ordinance takes effect 31 days from its publication, absent qualifications not relevant here. (L.A. Charter, § 252.)

to Judge David Yaffe. Following a hearing on May 2, 2007, Judge Yaffe granted the petition, and judgment was entered on May 31, 2007. This appeal followed.

## DISCUSSION

Appellants contend that the trial court erred in granting the petition. We agree.

### A. *Governing Principles*

■ The key issues before us concern whether the City Council properly approved the Zone Ordinance after repealing the Wage Ordinance in the face of respondents' certified referendum petition. "The referendum is the means by which the electorate is entitled, as a power reserved by it under our state Constitution, to approve or reject measures passed by a legislative body. (Cal. Const., art. II, §§ 9, subd. (a), 11 & art. IV, § 1 . . . .)" (*Empire Waste Management v. Town of Windsor* (1998) 67 Cal.App.4th 714, 717–718 [79 Cal.Rptr.2d 262], citation omitted.) Under the referendum provisions of the California Constitution, the electors may approve or reject statutes "except urgency statutes, statutes calling elections, and statutes providing for tax levies or appropriations for usual current expenses of the State." (Cal. Const., art. II, § 9, subd. (a); see Cal. Const., former art. IV, § 1.) As characterized by our Supreme Court in *Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473] (*Associated Home Builders*): "The amendment of the California Constitution in 1911 to provide for the initiative and referendum signifies one of the outstanding achievements of the progressive movement of the early 1900's. [Fn. omitted.] Drafted in light of the theory that all power of government ultimately resides in the people, the amendment speaks of the initiative and referendum, not as a right granted the people, but as a power reserved by them."

■ Shortly after the 1911 amendment, the court in *In re Stratham* (1920) 45 Cal.App. 436 [187 P. 986] (*Stratham*) concluded that "when an ordinance which has been suspended by a referendum has been repealed by [a municipal] council, the council cannot enact another ordinance in all essential features like the repealed ordinance . . . . The council may, however, deal further with the subject matter of the suspended ordinance, by enacting an ordinance essentially different from the ordinance protested against, avoiding, perhaps, the objections made to the first ordinance. If this be done, not in bad faith, and not with intent to evade the effect of the referendum petition, the second ordinance should not be held invalid for this cause. [Citations.]" (*Id.* at pp. 439–440.) Subsequently, several courts have followed or endorsed this rule. (See *Assembly v. Deukmejian* (1982) 30 Cal.3d 638, 678 [180 Cal.Rptr.

297, 639 P.2d 939] (*Assembly*); *Gilbert v. Ashley* (1949) 93 Cal.App.2d 414, 415 [209 P.2d 50] (*Gilbert*); *Martin v. Smith* (1959) 176 Cal.App.2d 115, 118 [1 Cal.Rptr. 307] (*Martin*); *Reagan v. City of Sausalito* (1962) 210 Cal.App.2d 618, 629–630 [26 Cal.Rptr. 775] (*Reagan*); *Lindelli v. Town of San Anselmo* (2003) 111 Cal.App.4th 1099, 1110 [4 Cal.Rptr.3d 453] (*Lindelli*).) Here, appellants contend that the City Council is not subject to the rule first articulated in *Stratham*, and alternatively, that the trial court incorrectly determined that the Zone Ordinance was "in all essential features like" the Wage Ordinance. (*Stratham, supra*, 45 Cal.App. at p. 439.) As we elaborate below, these contentions present questions regarding the interpretation of the California Constitution and municipal ordinances that we resolve de novo. (See *Lindelli, supra*, 111 Cal.App.4th at p. 1104.)

### B. *Applicability of the* Stratham *Rule*

Appellants contend that the *Stratham* rule does not govern the City Council's actions because the City is a charter city. They argue that the California Constitution does not impose the *Stratham* rule on charter cities, that charter cities fall outside the scope of Elections Code section 9241, which subjects so-called "general law" cities to the rule, and that the City's charter itself does not authorize the rule.

█ In our view, the California Constitution subjects the City Council to the *Stratham* rule. In *Associated Home Builders,* our Supreme Court stated: "Declaring it 'the duty of the courts to jealously guard this right of the people' [citation], the courts have described the initiative and referendum as articulating 'one of the most precious rights of our democratic process.' [Citation.] '[I]t has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right be not improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve power, courts will preserve it.' [Citations.]" (*Associated Home Builders, supra*, 18 Cal.3d at p. 591.) In light of these principles, as explained below, we conclude that the Constitution imposes the *Stratham* rule on charter cities, notwithstanding the absence of an express provision addressing this matter. (See Cal. Const., former art. IV, § 1; Cal. Const., art. II, §§ 8–11, art. IV, § 1.)

█ A charter city "is constitutionally entitled to exercise exclusive authority over all matters deemed to be 'municipal affairs.' (Cal. Const., art. XI, § 5.)" (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 783 [38 Cal.Rptr.2d 699, 889 P.2d 1019].) The City of Los Angeles became a charter city prior to the 1911 amendment to the Constitution reserving the right of initiative and referendum to electors. (See *Davies v. City of Los Angeles* (1890) 86 Cal. 37, 39–40 [24 P. 771].) Although the 1911 amendment provided that the right

was "self-executing," it authorized the Legislature to establish procedures for the exercise of the right, but exempted charter cities from the operation of any such statutes. (*Ibid.*) (Cal. Const., former art. IV, § 1.) Revisions to the 1911 amendment have not altered the substance of these provisions. (See *Associated Home Builders, supra,* 18 Cal.3d at p. 595 & fn. 12; *Rossi v. Brown* (1995) 9 Cal.4th 688, 698, fn. 4 [38 Cal.Rptr.2d 363, 889 P.2d 557]; *Midway Orchards v. County of Butte* (1990) 220 Cal.App.3d 765, 776–779 [269 Cal.Rptr. 796]; Cal. Const., art. II, § 11, subd. (a).)

Under these provisions, charter cities cannot deny their citizens the referendum powers reserved in the California Constitution, although charters may properly reserve broader referendum powers to voters. " ' "The constitutional reservation goes to the full extent expressed by its language. If the charter differs from the constitution in any respect it does not thereby diminish the powers reserved by the constitution. On the other hand, if the powers reserved by the charter exceed those reserved in the constitution the effect of the charter would be to give to the people the additional powers there described." [Citations.] In other words, as between the provisions of the Constitution and the provisions of a city charter, those which reserve the greater or more extensive referendum power in the people will govern.' " (*Rossi v. Brown, supra,* 9 Cal.4th at p. 698, quoting *Hunt v. Mayor & Council of Riverside* (1948) 31 Cal.2d 619, 622–623 [191 P.2d 426].) Accordingly, "[c]harter cities may provide for the exercise of the power of referendum in any manner that does not impinge on the basic right of referendum expressed in the Constitution." (*Browne v. Russell* (1994) 27 Cal.App.4th 1116, 1126 [33 Cal.Rptr.2d 29].)

The key issue, therefore, is whether the state Constitution impliedly subjects charter cities to the *Stratham* rule. Our research discloses that the rule was applied twice in published decisions before the Legislature enacted any statutes bearing on the rule. The first application of the rule involved the City of Los Angeles. In *Stratham,* the City Council enacted an ordinance in September 1919 barring taxicabs and related businesses from soliciting customers at railroad depots. (*Stratham, supra,* 45 Cal.App. at pp. 437–438.) Faced with a successful referendum petition challenging the ordinance, the City Council repealed it. (*Ibid.*) In November 1919, the City Council approved a second ordinance dealing with the same subject matter, which it characterized as an emergency measure. (*Ibid.*) An individual charged with a misdemeanor under the second ordinance filed a writ of habeas corpus, contending that the City Council had identified the ordinance as an emergency measure in bad faith to avoid the operation of the referendum petition. (*Ibid.*) In denying the petition, the court in *Stratham* declined to disturb the City Council's declaration of an emergency. (*Id.* at pp. 439–441.) Moreover,

pointing only to out-of-state case authority, the court applied the rule in question and concluded that the ordinances were substantially different. (*Id.* at pp. 439–440.)

The second application of the *Stratham* rule occurred in *Gilbert,* in which the court again did not examine the rule's constitutional basis. (*Gilbert, supra,* 93 Cal.App.2d at pp. 414–415.) There, the Escondido City Council enacted a business license ordinance in June 1947 that was defeated in a referendum election held in April 1948. (*Ibid.*) In December 1948, the city council enacted a similar ordinance which nonetheless provided—unlike the first ordinance—that the funds collected constituted a tax levy for the city's current expenses. (*Ibid.*) The court in *Gilbert* rejected a challenge to the second ordinance, reasoning that its status as a tax levy exempted it from the referendum provisions of the California Constitution. (93 Cal.App.2d at p. 415.) In addition, the court concluded that the two ordinances were sufficiently different to avoid the operation of the *Stratham* rule. (*Gilbert,* at pp. 415–416.)

Shortly after *Gilbert,* the Legislature enacted the predecessor of Elections Code section 9241. (Elec. Code, former § 1772, added by Stats. 1949, ch. 194, § 1, p. 426.) Elections Code section 9241, like its predecessor, applies to "general law" cities.[5] (See Elec. Code, § 9247; Elec. Code, former § 1777, added by Stats. 1939, ch. 26, pp. 49, 98.) The provision, as adopted in 1949 and in its current form, states that a qualified referendum petition stays an ordinance pending a vote on the referendum, and that if the legislative body of a city repeals the ordinance in the face of the petition, the "ordinance shall not again be enacted . . . for a period of one year after the date of its repeal." (Elec. Code, § 9241; see *id.,* former § 1772.) Since 1949, appellate courts have looked to *Stratham* and its progeny in applying this provision. (*Martin, supra,* 176 Cal.App.2d at pp. 118–119; *Reagan, supra,* 210 Cal.App.2d at pp. 629–631; *Lindelli, supra,* 111 Cal.App.4th at pp. 1108–1112.)

In *Assembly,* our Supreme Court invoked the *Stratham* rule in a context outside the scope of Elections Code section 9241. There, the court confronted challenges to referendum petitions that sought to have election district reapportionment statutes enacted by the Legislature submitted to the voters for their approval. (*Assembly, supra,* 30 Cal.3d at pp. 644–645.) After determining that the petitions were valid, the court clarified the consequences

---

[5] "The powers of a general law city include ' "only those powers expressly conferred upon it by the Legislature, together with such powers as are 'necessarily incident to those express-ly granted or essential to the declared object and purposes of the municipal corporation.' " ' " (*G. L. Mezzetta, Inc. v. City of American Canyon* (2000) 78 Cal.App.4th 1087, 1092 [93 Cal.Rptr.2d 292], quoting *Martin v. Superior Court* (1991) 234 Cal.App.3d 1765, 1768 [286 Cal.Rptr. 513].)

for the Legislature if the statutes were rejected through the referenda: "Since its inception, the right of the people to express their collective will through the power of the referendum has been vigilantly protected by the courts. Thus, it has been held that legislative bodies cannot nullify this power by voting to enact a law identical to a recently rejected referendum measure. (See *Gilbert*[, *supra*,] 93 Cal.App.2d 414, 415–416 . . . ; [*Stratham, supra*,] 45 Cal.App. [at pp.] 439–440 . . . .) Unless the new measure is 'essentially different' from the rejected provision and is enacted 'not in bad faith, and not with intent to evade the effect of the referendum petition,' it is invalid. [Citations.] Should the referenda here be rejected in the primary election, the Legislature will be governed by these rules in fashioning new reapportionment plans for the remainder of this decade." (*Assembly, supra*, 30 Cal.3d at p. 678.)

■ In view of this authority, the *Stratham* rule must be regarded as an implied element of the constitutional provisions reserving the referendum power. Because these provisions are self-enacting, the courts may properly devise procedures necessary to protect the power when the appropriate legislative body fails to establish such procedures. (See *Midway Orchards v. County of Butte, supra*, 220 Cal.App.3d at pp. 778–779.) Here, the *Stratham* rule was applied to the City prior to the enactment of the predecessor of Elections Code section 9241. Moreover, in *Assembly,* the court relied on *Stratham* in concluding that the Legislature "cannot nullify" the referendum power by enacting legislation essentially similar to that rejected in a referendum, notwithstanding the absence of a constitutional provision expressly addressing such conduct.[6] (*Assembly, supra*, 30 Cal.3d at p. 678.) Although *Assembly* did not present the issue raised here, its rationale implies that the City Council may not adopt an ordinance in contravention of the *Stratham* rule; to conclude otherwise would permit the nullification of the referendum power. Absent the *Stratham* rule, the legislative bodies of charter cities would be free to wear down opponents of ordinances, who necessarily incur the costs of collecting signatures for referendum petitions. Under the judicial policy favoring a liberal construction of the referendum power, we conclude that the City Council is subject to the rule.

Pointing to *Lawing v. Faull* (1964) 227 Cal.App.2d 23 [38 Cal.Rptr. 417] (*Lawing*), appellants contend that charter cities are exempt from the *Stratham* rule unless they incorporate it into their charters. There, a charter city imposed the requirement in its charter that referendum petitions would be certified only if signed by 20 percent of the voters. (*Lawing, supra*, at pp. 25–26.) Pointing to the judicial policy favoring the liberal construction of the

---

[6] On this matter, the California Constitution provides only that the filing of a referendum petition stays the pertinent legislation pending the voters' opportunity to approve or reject it. (Cal. Const., art. II, § 10, subd. (a); see *Lindelli, supra*, 111 Cal.App.4th at p. 1109.)

referendum power, proponents of a petition challenged the requirement on the ground that it contravened former article IV, section 1, of the California Constitution, which provided that "[u]ntil provided by law," no legislative body could require more than 10 percent of the electors sign a petition. (*Lawing, supra,* at pp. 26–30.) The court rejected this contention, concluding that the phrase, "[u]ntil provided by law," expressly permitted charter cities to deviate from the requirement. (*Id.* at pp. 27, 36.) Here, unlike *Lawing,* nothing in the California Constitution expressly authorizes the City to exempt itself from the *Stratham* rule.

■ Appellants also contend that the discussion of the *Stratham* rule in *Assembly* is dictum, and thus does not constitute authority on the issue before us. We disagree. Our Supreme Court's dicta, though not binding upon us, command our serious respect. (*Bunch v. Coachella Valley Water Dist.* (1989) 214 Cal.App.3d 203, 212 [262 Cal.Rptr. 513]; *People v. Jackson* (1979) 95 Cal.App.3d 397, 402 [157 Cal.Rptr. 154].) Because the *Assembly* dictum represents our Supreme Court's fullest analysis of the *Stratham* rule, we therefore follow it. (*Manufacturers Life Ins. Co. v. Superior Court* (1995) 10 Cal.4th 257, 287 [41 Cal.Rptr.2d 220, 895 P.2d 56].)

Appellants suggest that the *Stratham* rule is not needed to protect the referendum power because the electors, if dissatisfied with the City Council's conduct, are free to amend the City's charter to incorporate the rule or to vote against members of the City Council who seek reelection. In our view, the court in *Assembly* impliedly rejected the notion that this avenue of expressing dissatisfaction is sufficient to preserve the referendum power, given that the voters in statewide elections are also free to amend the Constitution and discharge members of the Legislature.

Finally, appellants contend that the *Stratham* rule is inapplicable to charter cities because unlike Elections Code section 9241, the rule does not specify the period of time a charter city is prohibited from adopting the second ordinance after withdrawing the first ordinance. It is unnecessary for us to address this contention, insofar as it seeks full clarification of the pertinent time period. Because the interval between the adoption of the Wage Ordinance and the Zone Ordinance is essentially equal to the analogous interval in *Stratham,* the situation before us falls squarely under that case. (*Stratham, supra,* 45 Cal.App. at pp. 437–438.)

C. *Analysis of the Ordinances*

■ The remaining issue concerns the application of the *Stratham* rule to the Wage and Zone Ordinances. Under the *Stratham* rule, "[t]he determination whether subsequent legislation is essentially the same begins with a

comparison of the terms of the legislation challenged by referendum and the subsequent legislation, focusing on the features that gave rise to popular objection." (*Lindelli, supra,* 111 Cal.App.4th at p. 1111.) We may consult the record as a whole to identify the "popular" objections to the Wage Ordinance. (See *ibid.*) Upon making this identification, we look to the language of the Wage and Zone Ordinances to determine whether they are "essentially different," and whether the City Council enacted the Zone Ordinance "not in bad faith, and not with intent to evade" the referendum petition (*Stratham, supra,* 45 Cal.App. at pp. 439–440). (See *Gilbert, supra,* 93 Cal.App.2d at p. 416; *Reagan, supra,* 210 Cal.App.2d at p. 631.)[7] Moreover, "every presumption is in favor of [the] validity" of the Zone Ordinance. (*Gilbert, supra,* 93 Cal.App.2d at p. 416; accord, *Reagan, supra,* 210 Cal.App.2d at p. 631.)

In *Stratham,* the first ordinance enacted by the City Council prohibited taxicabs and other entities from soliciting patrons near railroad depots and within defined areas of the city, absent consent from the affected railroads and businesses, but exempted carriers who solicited passengers in certain ways from the scope of the prohibition.[8] (See *Stratham, supra,* 45 Cal.App. at pp. 438–439.) The second ordinance approved by the City Council expanded the areas covered by the prohibition to encompass the solicitation of passengers on boats and other common carriers; it eliminated the exemption for certain forms of solicitation; and it added new prohibitions against the solicitation of "patronage upon any public street in a loud, noisy, boisterous manner," along with other forms of interference with individuals and their baggage. The ordinance also contained a declaration that absent the measure,

---

[7] Generally, the courts have indicated that absent special circumstances—for example, ambiguity in the ordinances—the existence of material differences and the absence of bad faith are assessed solely by reference to the language of the ordinances. (See *Gilbert, supra,* 93 Cal.App.2d at p. 416; *Martin, supra,* 176 Cal.App.2d at pp. 120–121.) We see no special circumstances here, and thus do not examine the extrinsic evidence to resolve these issues.

Appellants and respondents submitted considerable evidence bearing on these issues. The trial court sustained appellants' objections to respondents' evidence, concluding that its inquiry was limited to an examination of the language of the ordinances. Respondents do not challenge this ruling on appeal.

Before the trial court, appellants argued that the City Council incorporated certain elements in the Zone Ordinance in a good faith effort to address objections to the Wage Ordinance, and that it adopted the Zone Ordinance after receiving assurances that it would not be opposed. The trial court concluded that appellants' showing did not establish that respondents' conduct prior to the approval of the Zone Ordinance estopped them from challenging it. On appeal, appellants argue that the trial court was obliged to examine their evidence to determine whether the City Council acted in good faith in approving the Zone Ordinance. For the reasons explained above, we disagree.

[8] At appellants' request, we have taken judicial notice of the ordinances at issue in *Stratham,* which are part of the record in that case, but were not described in detail in the opinion. (See *Stratham, supra,* 45 Cal.App. at p. 440.) We may properly examine the ordinances to inform our understanding of the decision in *Stratham.* (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 946, p. 989.)

"the general public, but especially the traveling public . . . arriving in the City . . . by rail and otherwise, will be greatly annoyed, inconvenienced and harassed and their comfort, safety, welfare and health endangered . . . ." The court in *Stratham* held that "the two ordinances differ[ed] from each other, not merely in phraseology, but in substance relating to items of importance," and that nothing in the second ordinance suggested bad faith. (*Id.* at p. 440.)

In *Gilbert*, the second ordinance, like the first, imposed a business license assessment, but unlike its predecessor, contained a declaration that it constituted a tax levy for the usual current expenses; moreover, it differed from the first ordinance because it imposed a dissimilar tax rate, dealt with a new tax year, and contained novel exemption and enforcement provisions. (*Gilbert, supra,* 93 Cal.App.2d at p. 415.) The court concluded that it was unlike the first ordinance "in all its essential features and provisions," and lacked any trace of bad faith. (*Id.* at pp. 415–416.)

Again, in *Reagan,* the City Council of Sausalito enacted two ordinances committing it to buy waterfront property from a nonprofit private corporation and then lease a portion of the property to the corporation, which planned to allow recreational activities on it. (*Reagan, supra,* 210 Cal.App.2d at p. 630.) Faced with a referendum petition challenging the ordinances, the city council repealed them and enacted a third ordinance authorizing the use of city revenues to purchase the property for use as a public recreation area. (*Ibid.*) Because the third ordinance lacked any reference to a lease involving the corporation, the court in *Reagan* concluded that it was essentially different from the first two ordinances, and displayed no evidence of bad faith. (*Ibid.*)

In contrast with *Stratham, Gilbert,* and *Reagan,* the court reached a contrary conclusion in *Martin*. There, the City of Sausalito owned waterfront property subject to a lease. (*Martin, supra,* 176 Cal.App.2d at pp. 116–117.) In April 1959, the City Council of Sausalito adopted an ordinance permitting a sublease of the property until 2007. (*Ibid.*) After a referendum petition concerning the ordinance was presented to the city council, it repealed the ordinance and approved a second ordinance identical to the first, except that it terminated the sublease in 2002, changed the rental fee of the lease, and included another parcel of land in the lease. (*Id.* at p. 120.) The court held that the ordinances were "essentially the same" under the *Stratham* rule, reasoning that the new features in the second ordinance did not address the objectionable aspects of the first ordinance, which it identified as the character of the sublease. (*Martin,* at pp. 120–121.) The court stated: "No one will contend that the voters signing the referendum petition were doing so because of the extra five-year period in the terms of the leases. Undoubtedly the voters were concerned with the fundamental principle of the resolutions,

namely, the leasing of city property for the commercial purposes specified in the resolutions. That principle was identical in [the resolutions]." (*Id.* at p. 120.)

Similarly, in *Lindelli*, the town council of San Anselmo passed an ordinance awarding a five-year contract to a waste management company. (*Lindelli, supra*, 111 Cal.App.4th at pp. 1102–1103, 1111.) Confronted with a certified referendum petition challenging the ordinance, the town council set the vote on the referendum for the earliest permissible election date and awarded a one-year interim contract to the waste management company prior to the election. (*Lindelli, supra*, 111 Cal.App.4th at p. 1103.) Applying the *Stratham* rule, the court concluded that the interim contract contravened the stay provisions of Elections Code section 9241 because the two contracts differed only in the length of their terms. (*Lindelli, supra*, at pp. 1113–1114.)

We conclude that the ordinances before us are as distinct as those at issue in *Stratham, Gilbert*, and *Reagan*. Although the referendum petition circulated by respondents does not recite specific objections to the Wage Ordinance, the record contains undisputed evidence establishing that the ordinance was subject to two challenges: respondents objected to the economic burden imposed by the Wage Ordinance because it mandated higher minimum wage requirements on hotels near the Los Angeles International Airport, whereas the Chamber of Commerce objected to the prospect that similar requirements would be imposed elsewhere.

The Zone Ordinance contains substantive provisions that address the economic burdens of the wage requirements and the potential for their imposition outside the PBID. To offset the effects of higher minimum wage requirements on the affected hotels, the Zone Ordinance creates an "Airport Hospitality Enhancement Zone" entitled to various guaranteed economic benefits and enhancements. The City commits to spend $1 million on street improvements in the airport hotel corridor; it grants $50,000 for a market analysis to attract businesses to the zone; and it commits to implement and fund a five-year job training program for hotel and restaurant workers. Moreover, the Zone Ordinance requires the City to complete a series of studies addressing the construction of a conference center, a reduction in business taxes and remote airport check-in facilities, while working with interested businesses to promptly develop a joint recycling and waste diversion program.

In addition, the Zone Ordinance mitigates the direct impact of the wage requirements by mandating their implementation in phases, delaying full implementation, and providing exemptions for hotels that find the requirement excessively burdensome. The ordinance also commits the City to

conduct a study of the effects of the promised enhancements and the wage requirements, and mandates suspension of the wage requirements of the Zone Ordinance if the study is not completed within a specified period. To alleviate concerns that similar requirements will be imposed elsewhere, the Zone Ordinance prohibits the imposition of such measures outside the zone unless the affected area receives benefits comparable to those provided to the airport hotels by the Zone Ordinance. Moreover, the Zone Ordinance prohibits the imposition of any such ordinance absent careful study of its effects on the region and industry affected, followed by public hearings.

In our view, the new features in the Zone Ordinance, on their face, render it "essentially different" from the Wage Ordinance (*Stratham, supra,* 45 Cal.App. at pp. 439–440). Unlike the analogous ordinances in *Martin* and *Lindelli,* which did not address the objectionable features of the initial ordinances, the Zone Ordinance contains provisions that confront the "popular" objections to the Wage Ordinance and attempt to address them. Because nothing in the Zone Ordinance betrays bad faith, the City Council did not contravene the *Stratham* rule in approving it.

In reaching the contrary conclusion, the trial court acknowledged the commitments undertaken by the City in the Zone Ordinance, but determined that they were "to a great extent illusory," and thus "[were] not sufficient to materially change" the aspects of the Wage Ordinance to which the voters objected. These determinations are not supported by the terms of the ordinances, which mark the boundary of judicial review. By its language, the Zone Ordinance is different from the Wage Ordinance in tangible, concrete and significant ways. It is undisputed that the City Council attempted to address the challenges to the Wage Ordinance, and it is undisputed that the Zone Ordinance contains a variety of enhancements—including guaranteed financial commitments exceeding $1 million—as well as measures to mitigate the financial impact of wage requirements on the affected hotels. The question is not whether the Zone Ordinance wholly alleviates the concerns of those who opposed the Wage Ordinance, but whether it addresses them. (See *Stratham, supra,* 45 Cal.App. at p. 440.) Any attempt to assess the ultimate efficacy of such measures exceeds the scope of judicial review.[9]

Respondents contend that when, as here, the second ordinance contains provisions that are essentially identical to the provisions of the first ordinance that triggered opposition, the second ordinance is necessarily invalid under the *Stratham* test, despite the addition of new provisions. We disagree. *Stratham* itself establishes that two ordinances containing similar provisions

---

[9] The trial court also concluded that the City Council had acted in bad faith in approving the Zone Ordinance because it was not materially different from the Wage Ordinance. For the reasons explained above, we also reject this determination.

may nonetheless be essentially different when the second ordinance adds new provisions on matters of substance. There, the second ordinance reaffirmed in essentially similar terms the prohibition on the solicitation of patronage found in the first ordinance, and added new provisions that actually broadened the scope of the prohibition, together with a declaration by the City Council regarding the gravity of the matter addressed by the second ordinance. (*Stratham, supra*, 45 Cal.App. at p. 440.) The court held that the second ordinance differed from the first "in substance relating to items of importance." (*Ibid.*)

In an apparent effort to distinguish *Stratham*, respondents contend that in that case the first ordinance, unlike the second, was discriminatory, and that this purported difference was central to the court's determination that the two ordinances were essentially dissimilar. They thus suggest that because the Wage and Zone Ordinances affect the same class of hotels, they are materially alike. Respondents misread *Stratham*. The court's sole reference to the potentially discriminatory nature of the ordinances occurs in its discussion of an unrelated issue, namely, whether the *second* ordinance was "unconstitutional and discriminatory" because it barred only carriers who lacked written consent from soliciting patronage. (*Stratham, supra,* 45 Cal.App. at pp. 438–441.) The court concluded that "the terms of the ordinance do not create any unlawful discrimination between persons who have, and others who have not, written consent . . . ." (*Id.* at p. 440.) Because the two ordinances contained essentially similar provisions regarding consent, the court in *Stratham* could not have determined that they were different on this basis.

We conclude that the provisions of the Zone Ordinance, taken as a whole, place it squarely within the *Stratham* court's characterization of a proper second ordinance: the provisions of the Zone Ordinance, on their face, are substantial, relate to items of importance, and aim at "avoiding, perhaps, the objections made to the first ordinance." (*Stratham, supra*, 45 Cal.App. at p. 440.) The provisions of the Zone Ordinance directly address the objections to the Wage Ordinance by providing guaranteed tangible economic benefits to the hotels that mitigate the financial burden of the wage requirements, while limiting imposition of such requirements in other areas of the City. Accordingly, the trial court erred in granting the writ petition.[10]

## DISPOSITION

The judgment is reversed. The matter is remanded to the trial court with directions to vacate the orders enjoining appellant Frank Martinez from

---

[10] In view of this conclusion, it is unnecessary for us to address appellants' contention that Judge Janavs improperly enjoined appellant Frank Martinez from publishing the zone ordinance.

publishing the zone ordinance and granting the petition for writ of mandate, and to enter a new order denying the petition for writ of mandate. Appellants are awarded their costs on appeal.

Willhite, Acting P. J., and Suzukawa, J., concurred.

Respondents' petition for review by the Supreme Court was denied April 9, 2008, S160679.

# APPENDIX A
# WAGE ORDINANCE

ORDINANCE NO. 178082

An ordinance amending Chapter XVIII of the Los Angeles Municipal Code and adding Article 2 to Chapter XVIII of the Los Angeles Municipal Code to require LAX-area hotels to pay certain hotel service workers a living wage.

## THE PEOPLE OF THE CITY OF LOS ANGELES
## DO ORDAIN AS FOLLOWS:

Section 1. The title of Chapter XVIII of the Los Angeles Municipal Code is amended to read:

### XVIII. WORKFORCE REGULATIONS.

Sec. 2. Chapter XVIII, "Grocery Worker Retention Ordinance," is amended to read:

### ARTICLE 1. GROCERY WORKER RETENTION ORDINANCE.

Sec. 3. A new Article 2 is added to Chapter XVIII of the Los Angeles Municipal Code to read:

### ARTICLE 2.
### HOTEL WORKER LIVING WAGE ORDINANCE

### SEC. 182.00. PURPOSE.

The Los Angeles International Airport (LAX) is among the world's busiest airports, hosting millions of travelers every year. The City of Los Angeles (City) operates and maintains LAX, and, as a result of this support, the businesses in the area adjacent to LAX reap significant economic benefits. In particular, the hotels in the LAX area enjoy the highest occupancy rate of all Los Angeles hotels due to their proximity to LAX.

Despite the high occupancy rates of hotels in the LAX area, many of these hotels fail to pay their service workers a living wage. The inadequate compensation typically paid today also fails to provide hotel workers with resources sufficient to afford life in Los Angeles. It is unacceptable that hotels that derive a direct benefit from the City's maintenance and operation of LAX should place a burden on social services in Los Angeles. The City, as a provider of social support services, has an interest in promoting an employment environment that protects such limited resources. In requiring the payment of a higher minimum level of compensation, this article benefits that interest.

By way of this ordinance, the City seeks to improve the welfare of service workers at LAX-area hotels by ensuring that they receive decent compensation for the work they perform. Payment of a living wage to hotel workers alleviates the demands

1.

000555

for social services provided by the City and other local governments due to substandard compensation. Whereas LAX-area hotels derive a distinct benefit from their location near the airport, they have both the ability and responsibility to support the local workforce by engaging in fair employment practices.

## SEC. 182.01. DEFINITIONS.

The following definitions shall apply to this article:

A. "City" means the City of Los Angeles.

B. "Hotel" means a residential building located within the area designated by ordinance as the Gateway to LA (Century Corridor) Property Business Improvement District (Century Corridor PBID) that is designated or used for lodging and other related services for the public, and containing 50 or more guest rooms, or suites of rooms. "Hotel" also includes any contracted, leased, or sublet premises connected to or operated in conjunction with the building's purpose or providing services at the building. If the Century Corridor PBID ceases to exist, the boundaries at the time of dissolution shall remain in effect for purposes of this article.

C. "Hotel Employer" means a Person who owns, controls, and/or operates a Hotel, or a Person who owns, controls, and/or operates any contracted, leased, or sublet premises connected to or operated in conjunction with the Hotel's purpose, or a Person who provides services at the Hotel.

D. "Hotel Worker" means any individual (1) whose primary place of employment is at a Hotel, and (2) who is employed directly by the Hotel Employer, or by a Person who has contracted with the Hotel Employer to provide services at the Hotel. "Hotel Worker" does not include a managerial, supervisory, or confidential employee.

E. "Person" means an individual, corporation, partnership, limited partnership, limited liability partnership, limited liability company, business trust, estate, trust, association, joint venture, agency, instrumentality, or any other legal or commercial entity, whether domestic or foreign.

F. "Service Charge" means all separately-designated amounts collected by a Hotel Employer from customers that are for service by Hotel Workers, or are described in such a way that customers might reasonably believe that the amounts are for the service, including but not limited to those charges designated on receipts under the term "service charge," "delivery charge," or "porterage charge."

G. "Willful Violation" means that the Hotel Employer deliberately failed or refused to comply with the provisions of this article.

2

000556

### SEC. 182.03. PAYMENT OF MINIMUM COMPENSATION TO HOTEL WORKERS.

A. Wages. Hotel Employers shall pay Hotel Workers a wage of no less than the hourly rates set under the authority of this article. The minimum compensation for each Hotel Worker shall be at least $9.39 per hour with health benefits, not including gratuities, Service Charge distributions, or bonuses, or $10.64 per hour without health benefits, not including gratuities, Service Charge distributions, or bonuses. These rates shall continue to be adjusted annually to correspond with adjustments, if any, to the Consumer Price Index for Urban Wage Earners and Clerical Workers in Los Angeles-Riverside Counties.

B. Compensated Days Off. Hotel Employers shall provide Hotel Workers at least twelve accrued compensated days off per year for sick leave, vacation, or personal necessity at the Hotel Worker's request. Hotel Employers shall also permit Hotel Workers to take at least an additional ten accrued days a year of uncompensated time to be used for sick leave for the illness of the Hotel Worker or a member of his or her immediate family where the Hotel Worker has exhausted his or her compensated days off for that year.

### SEC. 182.04. HEALTH BENEFITS.

Health benefits under this article shall consist of the payment of at least $1.25 per hour towards the provision of health care benefits for Hotel Workers and their dependents. Proof of the provision of these benefits must be kept on file by the Hotel Employer, if applicable.

### SEC. 182.05. NOTIFYING HOTEL WORKERS OF THEIR POTENTIAL RIGHT TO THE FEDERAL EARNED INCOME CREDIT.

Hotel Employers shall inform Hotel Workers making less than $12 per hour of their possible right to the federal Earned Income Credit (EIC) under Section 32 of the Internal Revenue Code of 1954, 26 U.S.C. Section 32, and shall make available to Hotel Workers forms informing them about the EIC and forms required to secure advance EIC payments from the Hotel Employer.

### SEC. 182.06. RETALIATORY ACTION PROHIBITED.

A. No Hotel Employer shall discharge, reduce in compensation, or otherwise discriminate against any Hotel Worker for opposing any practice proscribed by this article, for participating in proceedings related to this article, for seeking to enforce his or her rights under this article by any lawful means, or for otherwise asserting rights under this article.

3

## SEC. 182.07. ENFORCEMENT.

A. A Hotel Worker claiming violation of this article may bring an action in the Superior Court of the State of California against a Hotel Employer and may be awarded:

1. For failure to pay wages required by this article -- back pay for each day during which the violation continued.

2. For failure to pay health benefits -- the differential between the wage required by this article without benefits and the wage with benefits, less amounts paid, if any, toward health benefits.

3. For retaliatory action -- reinstatement, back pay, and other legal or equitable relief the court may deem appropriate.

4. For Willful Violations, the amount of monies to be paid under Paragraphs 1 through 3 shall be trebled.

B. If a Hotel Worker is the prevailing party in any legal action taken pursuant to this section, the court shall award reasonable attorney's fees and costs as part of the costs recoverable.

C. Notwithstanding any provision of this Code or any other ordinance to the contrary, no criminal penalties shall attach for violation of this article.

## SEC. 182.08. EXEMPTION FOR COLLECTIVE BARGAINING AGREEMENT.

All of the provisions of this article, or any part of the article, may be waived in a bona fide collective bargaining agreement, but only if the waiver is explicitly set forth in that agreement in clear and unambiguous terms. Unilateral implementation of terms and conditions of employment by either party to a collective bargaining relationship shall not constitute or be permitted as a waiver of all or any part of the provisions of this article.

## SEC. 182.09. NO WAIVER OF RIGHTS.

Except for bona fide collective bargaining agreements, any waiver by a Hotel Worker of any or all of the provisions of this article shall be deemed contrary to public policy and shall be void and unenforceable. Any attempt by a Hotel Employer to have a Hotel Worker waive rights given by this article shall constitute a violation of this article.

## SEC. 182.10. COEXISTENCE WITH OTHER AVAILABLE RELIEF FOR SPECIFIC DEPRIVATIONS OF PROTECTED RIGHTS.

This article shall not be construed to limit a Hotel Worker's right to bring legal action for violation of other minimum compensation laws.

000558

## SEC. 182.11. SEVERABILITY.

If any provision of this article is found invalid by a court of competent jurisdiction, the remaining provisions shall remain in full force and effect.

5

000559

Sec. 4. The City Clerk shall certify to the passage of this ordinance and have it published in accordance with Council policy, either in a daily newspaper circulated in the City of Los Angeles or by posting for ten days in three public places in the City of Los Angeles: one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall; one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall East; and one copy on the bulletin board located at the Temple Street entrance to the Los Angeles County Hall of Records.

I hereby certify that the foregoing ordinance was introduced at the meeting of the Council of the City of Los Angeles NOV 15 2006 , and was passed at its meeting of NOV 2 2 2006 .

FRANK T. MARTINEZ, City Clerk

By _____
                                    Deputy

Approved    NOV 2 2 2006 _____

_____
                                    Mayor

Approved as to Form and Legality

ROCKARD J. DELGADILLO, City Attorney

By    _claudia cullins for_
      ADRIENNE KHORASANEE
      Deputy City Attorney

Date    10/17/06

File No.    06-0362

6.

000560

# APPENDIX B
# ZONE ORDINANCE

### ORDINANCE NO. 178432

An ordinance adding Article 4 to Chapter X of the Los Angeles Municipal Code to create an Airport Hospitality Enhancement Zone.

### THE PEOPLE OF THE CITY OF LOS ANGELES
### DO ORDAIN AS FOLLOWS:

Section 1. A new Article 4 is added to Chapter X of the Los Angeles Municipal Code to read:

### ARTICLE 4.
### AIRPORT HOSPITALITY ENHANCEMENT ZONE ORDINANCE

**SEC: 104.101. PURPOSE.**

The Los Angeles International Airport (LAX) is among the world's busiest airports, hosting millions of travelers every year. The Century Boulevard Corridor (Corridor) situated immediately adjacent to LAX serves as both the welcome mat to the City and the gateway to LAX. The Corridor, which greatly and uniquely benefits from its proximity to LAX, could benefit even more from strategic public investments, especially infrastructure improvements, neighborhood beautification, and a conference center. Accordingly, it is the City's intent to promote the economic vitality of the Corridor by designating it as an Airport Hospitality Enhancement Zone within which the City will target new City resources, investment and benefits.

The hotels in the Corridor will not only derive significant and unique business benefits from their close proximity to LAX, a major public and City asset that produces numerous patrons of these hotels on a daily basis, but from the City's designation of the Corridor as an Airport Hospitality Enhancement Zone. These benefits are unique as compared to any other industry in any other region of the City. Accordingly, the City finds that it is appropriate to impose a regulatory requirement to pay a living wage on certain hotels in the Corridor, a requirement that has not otherwise been imposed except upon companies with certain types of business relationships with the City. The City, as a provider of social support services and significant benefits through the City's designation of the Corridor as an Airport Hospitality Enhancement Zone, has an interest in promoting an employment environment that protects government resources and engages in responsible employment practices. In requiring the payment of a higher minimum level of compensation, this article benefits that interest.

By way of this ordinance, the City seeks to improve and encourage the continuing growth and development of the business community in the Century Boulevard Corridor, while simultaneously improving the welfare of service workers at LAX-area hotels by ensuring that they receive decent compensation for the work they perform. This ordinance provides for an investment in the workers, the local

1

000561

businesses, and the City at large by setting forth a plan that supports the labor and business communities located in the area adjacent to LAX.

SEC. 104.102. DEFINITIONS.

The following definitions shall apply to this article:

A. "City" means the City of Los Angeles.

B. "Hotel" means a residential building located within the Airport Hospitality Enhancement Zone that is designated or used for lodging and other related services for the public, and containing 50 or more guest rooms, or suites of rooms. "Hotel" also includes any contracted, leased, or sublet premises connected to or operated in conjunction with the building's purpose or providing services at the building. If the Century Corridor ) Property Business Improvement District ceases to exist, the boundaries at the time of dissolution shall remain in effect for purposes of this article.

C. "Hotel Employer" means a Person who owns, controls, and/or operates a Hotel, or a Person who owns, controls, and/or operates any contracted, leased, or sublet premises connected to or operated in conjunction with the Hotel's purpose, or a Person who provides services at the Hotel.

D. "Hotel Worker" means any individual (1) whose primary place of employment is at a Hotel, and (2) who is employed directly by the Hotel Employer, or by a Person who has contracted with the Hotel Employer to provide services at the Hotel. "Hotel Worker" does not include a managerial, supervisory, or confidential employee.

E. "Person" means an individual, corporation, partnership, limited partnership, limited liability partnership, limited liability company, business trust, estate, trust, association, joint venture, agency, instrumentality, or any other legal or commercial entity, whether domestic or foreign.

F. "Service Charge" means all separately-designated amounts collected by a Hotel Employer from customers that are for service by Hotel Workers, or are described in such a way that customers might reasonably believe that the amounts are for the service, including but not limited to those charges designated on receipts under the term "service charge," "delivery charge," or "porterage charge."

G. "Willful Violation" means that the Hotel Employer deliberately failed or refused to comply with the provisions of this article.

SEC. 104.103. THE AIRPORT HOSPITALITY ENHANCEMENT ZONE.

A. Establishment of Zone. There is hereby established an Airport Hospitality Enhancement Zone. The Airport Hospitality Enhancement Zone shall be the area designated by the boundaries of the Gateway to LA (Century Corridor) Property

000562

Business Improvement District (Century Corridor PBID), established by Ordinance Number 177211.

B. Enhancements. The City shall create enhanced and expanded City investments and incentives in the Airport Hospitality Enhancement Zone, including:

1. Conference Center

a. The City shall complete within 180 days of the effective date of the ordinance a study of possible locations for a conference center, including consideration of sites under control of City or LAWA.

b. The City shall complete within 180 days of the effective date of the ordinance a study of possible mechanisms to finance the construction and establishment of a conference center in the Airport Hospitality Enhancement Zone.

c. The City shall investigate LAWA participation in the financing of a conference center in the Airport Hospitality Enhancement Zone.

2. Workforce Development

a. CDD shall implement within 180 days of the effective date of the ordinance a workforce training program, which shall include one or more of customer service training, hospitality training, management training, and/or culinary arts training, for Hotel Workers. Training will occur at a location within the Airport Hospitality Enhancement Zone or within close proximity to the Airport Hospitality Enhancement Zone. Program(s) shall train 120 Hotel Workers per year for five years beginning in FY 2007-08. The City shall determine appropriate funding from among federal, state, and City funds.

b. CDD shall facilitate the provision of English as a Second Language courses by the Los Angeles Unified School District Adult Education Division or the Los Angeles Community College District, to Hotel Workers, with courses provided at Hotels where feasible and requested by Hotels in the Airport Hospitality Enhancement Zone.

3. Marketing

a. The City shall cause to be developed a program to market Hotels and other services in the Airport Hospitality Enhancement Zone.

b. The City shall grant $50,000 to the Century Corridor BID to prepare a market analysis and to develop materials and data from the

3

000563

analysis to use in attracting new business to the Airport Hospitality Enhancement Zone.

4. Business Development

a. In order to address office vacancy and generate business for Hotels in the Airport Hospitality Enhancement Zone, the Office of Finance shall develop and recommend within 90 days of the effective date of this ordinance a time-limited cap or reduction in business taxes for businesses that relocate from outside the City to vacant space in the Airport Hospitality Enhancement Zone.

b. In order to address the need for retail and restaurant services in the area and to generate business for Hotels in the Airport Hospitality Enhancement Zone, the Office of Finance shall develop and recommend within 90 days of the effective date of this ordinance a time-limited cap or reduction in business taxes for retail and restaurant businesses that open a new location in the Zone without closing any other location, if any, in the City.

5. Street Improvements

a. Bureau of Street Services shall develop and implement a program of directional/navigational signage to direct drivers to Hotels, rental car agencies, and other airport-related services in the Airport Hospitality Enhancement Zone.

b. Within nine months of the effective date of this ordinance, Bureau of Street Services shall commence construction of a $1 million set of street improvements, including new median islands, landscaping, refurbishment, and signage, for the portion of Century Boulevard between Aviation Boulevard and La Cienega Boulevard.

c. Bureau of Street Services shall develop within 60 days of the effective date of this ordinance a plan to expedite needed street and alley resurfacing and sidewalk repair in the Airport Hospitality Enhancement Zone, and shall commence this plan within 180 days of the effective date of this ordinance.

d. CAO and Bureau of Street Services shall report within 60 days of the effective date of this ordinance on options to finance and commence within one year construction of needed new sidewalks in the Airport Hospitality Enhancement Zone to facilitate pedestrian access from Hotels to public transit.

4

000564

### 6. Remote Check-In

CDD shall work with LAWA to facilitate the establishment of remote check-in facilities at each interested Hotel in Zone, including providing assistance as necessary to expedite or prioritize the establishment of these facilities as the network of region wide check-in locations grows.

### 7. Power Rate Incentive

The City shall investigate the feasibility of extending existing Enterprise and Empowerment Zone subsidized rate for electric power, or creating a new business development incentive rate to reduce office vacancy for buildings located within the Airport Hospitality Enhancement Zone.

### 8. Integrated Waste Management

In order to assist in realizing cost savings on hauling fees, Bureau of Sanitation shall work with interested businesses in the Airport Hospitality Enhancement Zone and Century Corridor BID to develop and implement within one year of the effective date of this ordinance a joint recycling and waste diversion program. Bureau of Sanitation's offered technical assistance shall include assistance in preparation of necessary bid documents, assistance in review of proposals and contract negotiations, preparation of outreach materials for staff, and training of staff.

## SEC. 104.104. PAYMENT OF MINIMUM COMPENSATION TO HOTEL WORKERS.

A.  **Wages.**  In accordance with Section 104.106 of this article, Hotel Employers shall pay Hotel Workers a wage of no less than the hourly rates set under the authority of this article. The minimum compensation for each Hotel Worker shall be at least $9.39 per hour with health benefits, not including gratuities, Service Charge distributions, or bonuses, or $10.64 per hour without health benefits, not including gratuities, Service Charge distributions, or bonuses. These rates shall continue to be adjusted annually to correspond with adjustments, if any, to the Consumer Price Index for Urban Wage Earners and Clerical Workers in Los Angeles-Riverside Counties.

B.  **Compensated Days Off.**  Hotel Employers shall provide Hotel Workers at least twelve accrued compensated days off per year for sick leave, vacation, or personal necessity at the Hotel Worker's request. Hotel Employers shall also permit Hotel Workers to take at least an additional ten accrued days a year of uncompensated time to be used for sick leave for the illness of the Hotel Worker or a member of his or her immediate family where the Hotel Worker has exhausted his or her compensated days off for that year.

5

000565

C. Mandatory Study. After one year from the effective date of this ordinance, the CAO shall conduct a study and evaluation of the effect of this article on Hotels, Hotel customers, and Hotel Workers in the Airport Hospitality Enhancement Zone.

1. The study shall include consideration of:

a. the economic impact of the living wage requirement on Hotels and Hotel Workers, including any effects on worker retention and /or training;

b. the effects of having a non-tiered living wage requirement that applies to tipped and non-tipped Hotel Workers alike, including any wage compression among hotel employees and the effects of such compression on worker retention; and

c. the impact of the enhancements described in section 104.103 on Hotel customer base, income, and retention and training of Hotel Workers.

2. If the study is not completed within 15 months from the date of the effective date of this ordinance, the living wage provisions of this ordinance shall be suspended until the report is completed.

SEC. 104.105. HEALTH BENEFITS.

A. Rate. Health benefits under this article shall consist of the payment of at least $1.25 per hour towards the provision of health care benefits for Hotel Workers and their dependents. Proof of the provision of these benefits must be kept on file by the Hotel Employer, if applicable.

B. Mandatory Study. Within six months of the effective date of this ordinance, the CAO shall complete a study of health benefits availability for Hotel Workers.

1. The study shall include consideration of:

a. available health benefits plans at businesses with similarly-sized employment forces, whether such plans generally require employee contribution and/or co-payments, and the amount of such employee contributions and/or co-payments;

b. prevailing, well-supported expert views, if any, on whether employee contributions and/or co-payments have a negative or positive effect on the cost of health care or on the quality of health care provided; and

6

000566

c. the City's ability, including applicable legal constraints, to secure high-quality health benefits for workers through regulation such as this article.

2. Upon completion of the study, the CAO shall also recommend whether the City should consider adjusting its living wage regulation for those Hotel Employers providing health benefits, for example by increasing the amount of the health benefits credit available to Hotel Employer or by permitting reasonable employee contributions or co-payments limited by regulation. If the study is not completed within 9 months from the date of the effective date of this ordinance, the living wage provisions of this ordinance shall be suspended until the report is completed.

C. This article is not intended to decrease the availability or utilization of employer-provided health benefits. The Hotel Employer has the sole choice whether or not to offer health benefits within the meaning of the section.

SEC. 104.106. INCREMENTAL APPLICATION OF LIVING WAGE PROVISIONS.

A. Upon the effective date of this ordinance, Hotel Employers shall pay Hotel Workers no less than $8.25 per hour with health benefits, not including gratuities, Service Charge distributions, or bonuses, or $9.50 per hour without health benefits, not including gratuities, Service Charge distributions, or bonuses.

B. On July 1, 2007, Hotel Workers shall be paid a living wage in its entirety, as required by section 104.104.A of this ordinance.

C. On January 1, 2008, Hotel Workers shall receive their first annual living wage adjustment, as specified in section 104.104.A of this ordinance, which requires annual adjustments to correspond to changes, if any, to the Consumer Price Index for Urban Wage Earners and Clerical Workers in Los Angeles-Riverside Counties.

SEC. 104.107. NOTIFYING HOTEL WORKERS OF THEIR POTENTIAL RIGHT TO THE FEDERAL EARNED INCOME CREDIT.

Hotel Employers shall inform Hotel Workers making less than $12 per hour of their possible right to the federal Earned Income Credit (EIC) under Section 32 of the Internal Revenue Code of 1954, 26 U.S.C. Section 32, and shall make available to Hotel Workers forms informing them about the EIC and forms required to secure advance EIC payments from the Hotel Employer.

SEC. 104.108. RETALIATORY ACTION PROHIBITED.

A. No Hotel Employer shall discharge, reduce in compensation, or otherwise discriminate against any Hotel Worker for opposing any practice proscribed by this article, for participating in proceedings related to this article, for seeking to enforce his or

7

her rights under this article by any lawful means, or for otherwise asserting rights under this article.

### SEC.104.109. ENFORCEMENT.

A. A Hotel Worker claiming violation of this article may bring an action in the Superior Court of the State of California against a Hotel Employer and may be awarded:

1. For failure to pay wages required by this article -- backpay for each day during which the violation continued.

2. For failure to pay health benefits -- the differential between the wage required by this article without benefits and the wage with benefits, less amounts paid, if any, toward health benefits.

3. For retaliatory action -- reinstatement, backpay, and other legal or equitable relief the court may deem appropriate.

4. For Willful Violations, the amount of monies to be paid under Paragraphs 1 through 3 shall be trebled.

B. If a Hotel Worker is the prevailing party in any legal action taken pursuant to this section, the court shall award reasonable attorney's fees and costs as part of the costs recoverable.

C. Notwithstanding any provision of this Code or any other ordinance to the contrary, no criminal penalties shall attach for violation of this article.

### SEC. 104.110. EXEMPTION FOR COLLECTIVE BARGAINING AGREEMENT.

All of the provisions of this article, or any part of the article, may be waived in a bona fide collective bargaining agreement, but only if the waiver is explicitly set forth in that agreement in clear and unambiguous terms. Unilateral implementation of terms and conditions of employment by either party to a collective bargaining relationship shall not constitute or be permitted as a waiver of all or any part of the provisions of this article.

### SEC. 104.111. ONE-YEAR WAIVER FOR CERTAIN HOTEL EMPLOYERS

This article is not intended to cause reduction in employment or work hours for Hotel Workers. Therefore, a Hotel Employer that demonstrates to the Controller, by compelling evidence, that compliance with this article would require the Hotel Employer to reduce its workforce by more than 20 percent or curtail its Hotel Workers' total work hours by more than 30 percent, in order to avoid bankruptcy or a shutdown of the Hotel, may receive a waiver, valid for no more than one year, from the requirements in this article. The Controller shall reach a determination only after reviewing and auditing, if

8

000568

necessary, the Hotel Employer's financial condition, with such review or audit paid for, at rates set by the Controller, by the Hotel Employer. The Controller's determination on a waiver application shall be subject to review and reversal by a two-thirds vote of the City Council within 10 business days of the Controller's determination.

### SEC. 104.112. NO WAIVER OF RIGHTS.

Except for bona fide collective bargaining agreements, any waiver by a Hotel Worker of any or all of the provisions of this article shall be deemed contrary to public policy and shall be void and unenforceable. Any attempt by a Hotel Employer to have a Hotel Worker waive rights given by this article shall constitute a violation of this article.

### SEC. 104.113. COEXISTENCE WITH OTHER AVAILABLE RELIEF FOR SPECIFIC DEPRIVATIONS OF PROTECTED RIGHTS.

This article shall not be construed to limit a Hotel Worker's right to bring legal action for violation of other minimum compensation laws.

### SEC. 104.114. PROCEDURES FOR FURTHER REGULATION.

A. The City shall not impose new regulatory requirements to pay a living wage exceeding applicable state or federal minimum wage requirements upon any business entity that does not have a business relationship with the City of Los Angeles in the future unless the City Council first secures a study that looks at the effects such a regulation would have:

1. on the industry and/or geographic location targeted, including any potential relocation or cessation of any business;

2. on the consumers or clients served by the industry and/or geographic location, including any increase in pricing they might face; and

3. on the city's and/or geographic location's ability to retain and attract new business to the area.

Such a study shall include an opportunity for public input, and the City Council will hear public testimony regarding the study at least two weeks before acting on any living wage proposal.

B. The City shall not impose new regulatory requirements to pay a living wage unless the industry and region to be regulated receive business benefits stemming from a City asset that match or exceed the benefit from proximity to LAX received by Hotels in the Airport Hospitality Enhancement Zone. Such benefits must be significant, but shall not include any of the following:

000569

1. use of city streets or sidewalks by customers or employees to access the businesses;

2. purchase of water and/or electrical power by the businesses from the City or Department of Water and Power;

3. provision of ordinary police, fire, and paramedic services to persons at the businesses;

4. City refuse collection from the businesses;

5. building or premises inspection by City departments for safety, emergency preparedness, and/or compliance with applicable regulation;

6. business or customer use of City facilities open to the general public; or,

7. any other City service provided throughout the City to the general public and /or private businesses.

C. Notwithstanding the foregoing, the City shall not apply the requirements in the preceding section if the industry to be regulated has so many employees being paid less than living wage as to have a significant negative effect on the City economy as a whole. The industry in question must have more than 15,000 employees working in the City. Before acting on such a proposal, the City Council will request a panel of three economists to submit a written report to Council presenting their expert opinion as to whether the industry to be regulated has more than 15,000 employees working in the City and that the number of employees being paid less than a living wage is so substantial as to have a significant negative effect on the City economy as a whole. The panel of three economists shall have one member selected by the County Federation of Labor, one member selected by the Los Angeles Area Chamber of Commerce, and one member selected by the other two members.

D. None of the procedures or intended requirements in this section shall apply to any living wage regulation that the City Council and Mayor decide to place before the voters for approval before the regulation takes effect.

## SEC: 104.115. SEVERABILITY.

If any provision of this article is found invalid by a court of competent jurisdiction, the remaining provisions shall remain in full force and effect, excepting only that if section 104.104.A is held invalid, then section 104.103.B shall also be considered invalid and of no effect.

000570

Sec. 2. The City Clerk shall certify to the passage of this ordinance and have it published in accordance with Council policy, either in a daily newspaper circulated in the City of Los Angeles or by posting for ten days in three public places in the City of Los Angeles: one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall; one copy on the bulletin board located at the Main Street entrance to the Los Angeles City Hall East; and one copy on the bulletin board located at the Temple Street entrance to the Los Angeles County Hall of Records.

I hereby certify that the foregoing ordinance was introduced at the meeting of the Council of the City of Los Angeles of **FEB 1 3 2007** and was passed at its meeting of **FEB 2 1 2007**.

FRANK T. MARTINEZ, City Clerk

By _____
                              Deputy

Approved    **FEB 2 6 2007**

_____
                              Mayor

Approved as to Form and Legality

ROCKARD J. DELGADILLO, City Attorney

By _____
THERESA STAMUS
Assistant City Attorney.

Date: _February 13, 2007_

File No. 06-0362-S3

11