Filed 3/6/20

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| COUNTY OF KERN et al.,<br><br>Plaintiffs and Respondents,<br><br>v.<br><br>ALTA SIERRA HOLISTIC EXCHANGE SERVICE et al.,<br><br>Defendants and Appellants. | F077887 & F078069<br><br>(Super. Ct. No. BCV-16-102480)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Thomas S. Clark, Judge.

Harris Bricken McVay, Julie A. Hamill; Law Offices of Jay Jamieson, Jr., and Jay Jamieson for Defendants and Appellants.

Margo A. Raison, County Counsel, Phillip T. Jenkins, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

In 2009, the Board of Supervisors (Board) of the County of Kern (County) adopted an ordinance allowing medical marijuana dispensaries in commercially zoned areas, treating them similar to pharmacies.  In 2011, the County adopted a new ordinance,

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III. and IV. of the Discussion.

effectively banning medical marijuana dispensaries in the County and declaring them a public nuisance.

The next month, a valid protest petition was received by the Board protesting the recently enacted dispensary ban ordinance. In response, the Board adopted a repeal ordinance, which not only repealed the protested 2011 ban ordinance, but also repealed the 2009 ordinance allowing medical marijuana dispensaries in commercially zoned areas.

Elections Code section 9145[1] provides that when a county board of supervisors receives a valid referendum petition protesting the adoption of an ordinance, the board must either "entirely repeal the ordinance" or submit it to the voters. In April 2016, this court interpreted "the phrase 'entirely repeal the ordinance' to mean that a board must (1) revoke the protested ordinance in all its parts and (2) not take additional action that has the practical effect of implementing the essential feature of the protested ordinance." (*County of Kern v. T.C.E.F., Inc.* (2016) 246 Cal.App.4th 301, 308 (*T.C.E.F.*).) We held the repeal of the 2009 ordinance to be invalid and concluded that the repeal of the 2009 ordinance was, in practical effect, a reenactment of the ban on dispensaries contained in the protested ordinance. (*Id*. at pp. 308, 326.)

This appeal raises the legal question of how long a board of supervisors must wait before reenacting the essential feature of the protested ordinance. The constitutional provisions addressing the referendum power, the text of section 9145, and published judicial decisions do not provide a direct answer for referenda at the county level. We resolve the question by interpreting section 9145 to mean a board of supervisors may reenact the essential feature of the repealed ordinance after there has been a material change in circumstances. A change in circumstances is material if an objectively

---

[1]     All unlabeled statutory references are to the Elections Code.

reasonable person would consider the new circumstances significant or important in making a decision about the subject matter of the ordinance.

In applying this statutory interpretation to the facts presented, we conclude the relevant period began in February 2012, when the Board repealed an ordinance banning marijuana dispensaries after receiving a referendum petition. The period ended in May 2016, when an ordinance placing a moratorium on new dispensaries—an essential feature of the 2011 protested ordinance—was adopted as an urgency measure. We conclude the record shows that during this period the circumstances relevant to the regulation of marijuana dispensaries changed materially. Consequently, the Board did not violate section 9145 when it enacted the May 2016 moratorium on new dispensaries or subsequently banned dispensaries. Accordingly, the ordinance banning dispensaries is enforceable.

In the unpublished portion of this opinion, we address defendants' contention that substantial evidence does not support the factual findings underlying the issuance of a permanent injunction prohibiting them from operating a marijuana dispensary. Specifically, we consider the implied finding that there was a realistic prospect defendants intended to engage in the prohibited activity in the future, despite having not operated the dispensary after June 27, 2017, the effective date of the Medicinal and Adult-Use Cannabis Regulation and Safety Act (MAUCRSA; Bus. & Prof. Code, § 26000 et seq., as amended by Stats. 2017, ch. 27, § 4). We conclude the inferences reasonably drawn from the actual evidence presented do not support the implied finding that defendants intended to operate an unlicensed marijuana dispensary in the future.

We therefore reverse the permanent injunction portion of the judgment.

**FACTS**

*Parties*

Plaintiff County is a political subdivision of the State of California. Plaintiff Greg Fenton is the Kern County Director of Engineering, Surveying, and Permit Services

3.

Department and he has been authorized by the Board to be the Kern County Building Official for purposes of the Kern County Ordinance Code (KCOC). Plaintiffs are referred to collectively as County.

Defendant Alta Sierra Holistic Exchange Service (ASHES) filed articles of incorporation as a nonprofit mutual benefit corporation with the California Secretary of State on May 4, 2016. The articles stated the specific purpose of the corporation was to "coordinate transactions between members." Defendant Thomas Jay Jamieson, Jr. signed the articles as the incorporator and was listed as the agent for service of process. ASHES and Jamieson are referred to collectively as defendants.

On May 9, 2016, ASHES obtained a seller's permit from the California State Board of Equalization. The permit authorized ASHES, pursuant to the Sales and Use Tax Law, to engage in the business of selling tangible personal property at an address in Wofford Heights, in the rural foothills of the Sierra Nevada mountains, east of Bakersfield. Defendants began operating a medical marijuana dispensary in Wofford Heights sometime after May 10, 2016, and ceased operations before June 27, 2017, the effective date of MAUCRSA. Jamieson owns the real estate where the marijuana dispensary operated.

*History of County Ordinances*

In July 2006, County adopted its first medical marijuana dispensary ordinance, which was codified as chapter 5.84, "Medical Marijuana Dispensaries," in title 5 of the KCOC. The ordinance granted the County's sheriff's department the authority to license medical marijuana dispensaries and required dispensaries to follow certain operating and record keeping requirements.

In March 2009, County adopted Ordinance No. G-7849, which repealed the 2006 ordinance and set forth a new section 5.84.010 in chapter 5.84 of the KCOC (2009 Ordinance). The 2009 Ordinance removed most of the restrictions on medical marijuana

dispensaries, treated each dispensary as a pharmacy for zoning purposes, and stated a dispensary could not be located within 1000 feet of a school.

Twice in 2010, County adopted moratoria on the establishment of any new medical marijuana dispensaries and prohibited existing medical marijuana dispensaries from relocating. While the second moratorium was in effect, County held workshops where the public could express their opinions about medical marijuana dispensaries and County's regulation of them.

On August 2, 2011, the Board held a public hearing on another extension of the moratorium. The staff report for this public hearing discussed the proposed extension and also proposed ordinances to ban medical marijuana dispensaries and outdoor cultivation of marijuana. At the conclusion of the hearing, the Board voted to extend the moratorium for one year.

A week later, the Board held another public hearing on the proposed ordinance banning dispensaries. Near the end of the hearing, the Board adopted Ordinance No. G-8191 (2011 Dispensary Ban Ordinance), which provided that "[a]ny operation of a Medical Marijuana Collective is prohibited in the County" (former KCOC, § 5.84.040) and declared the operation of a medical marijuana dispensary to be a public nuisance subject to abatement and administrative penalties (former KCOC, § 5.84.060). The 2011 Dispensary Ban Ordinance was scheduled to take effect on September 9, 2011.

Before the 2011 Dispensary Ban Ordinance went into effect, County received a referendum petition protesting most of its provisions. The protest petition was timely and had a sufficient number of signatures. As required by section 9144, the protested sections of the 2011 Dispensary Ban Ordinance were suspended. Those sections stated the purpose and intent of the ordinance, banned medical dispensaries, banned edibles containing medical marijuana, and declared medical marijuana dispensaries to be a public nuisance subject to abatement. County was required by section 9145 to (1) entirely

5.

repeal the 2011 Dispensary Ban Ordinance or (2) submit it to the voters at the next regularly scheduled county election or at a special election called for that purpose.

On February 21, 2012, the Board chose to place an alternate ordinance on the June 5, 2012, primary election ballot. The alternate ordinance was named Measure G and, among other things, restricted medical marijuana dispensaries to areas zoned for industrial use.

On February 28, 2012, to comply with section 9145, the Board adopted Ordinance No. G-8257 (Repeal Ordinance), which stated that "Chapter 5.84 of Title 5 of the Kern County Ordinance Code is hereby repealed in its entirety." The repeal was scheduled to become effective on March 30, 2012. In County's view, the Repeal Ordinance left no provision in the KCOC allowing medical marijuana dispensaries. Under this view, the repeal of the 2011 Dispensary Ban Ordinance did not revive the 2009 Ordinance and its authorization of dispensaries in commercial zones. Thus, the Repeal Ordinance could be viewed as a parliamentary slight-of-hand in that it appeared to comply with section 9145 by repealing the protested 2011 Dispensary Ban Ordinance. However, it also eliminated all provisions in the KCOC authorizing medical marijuana dispensaries, thereby rendering the dispensaries an unauthorized, nonconforming land use.[2]

At the June 5, 2012, primary election, 69,530 voters out of 100,698 cast their ballots to approve Measure G. Measure G, however, was successfully challenged in a lawsuit alleging the environmental review required by the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) had not been completed. In

---

[2] The KCOC is a "permissive" code under which any uses not specifically permitted are prohibited. (KCOC, § 19.02.060, subds. A. C.; *T.C.E.F.*, *supra*, 246 Cal.App.4th at p. 324.) In *City of Corona v. Naulls* (2008) 166 Cal.App.4th 418, the court stated the city's municipal code was permissive and, "because medical marijuana dispensaries are not enumerated within the code, [the defendant dispensary] is operating within the City as a nonpermitted, nonconforming use. As such, [defendant's] operation is a nuisance per se and may be abated by means of injunctive relief .…" (*Id*. at p. 425.)

that lawsuit, the trial court found CEQA had been violated and invalidated Measure G. In March 2016, this court upheld the trial court's decision.

On April 5, 2016, we filed our decision in *T.C.E.F.*, which concluded the repeal of the 2009 Ordinance authorizing dispensaries was, in practical effect, a reenactment of the ban on dispensaries contained in the protested ordinance. (*T.C.E.F.*, *supra*, 246 Cal.App.4th at p. 308.) Accordingly, the Board's repeal of the 2009 Ordinance violated section 9145 and, as a result, we concluded the 2009 Ordinance remained in effect. (*Ibid.*)

*New Ordinances*

On May 10, 2016, before remittitur was issued and the decision in *T.C.E.F.* became final, the Board unanimously adopted Ordinance No. G-8630 and placed a moratorium on the establishment of new medical marijuana dispensaries. The ordinance was adopted as an urgency measure and the Board's findings constituting its declaration of urgency were set forth in KCOC former section 5.86.020. In June 2016, the Board extended the moratorium for 10 months and 15 days pursuant to Government Code section 65858, subdivision (a).

On November 8, 2016, California voters passed Proposition 64 as an initiative measure. Proposition 64 legalized adult, recreational use of marijuana and reduced the criminal penalties for various offenses involving marijuana, including its cultivation and possession for sale.

In April 2017, the Board unanimously extended the moratorium on the establishment of medical marijuana dispensaries for an additional year. On June 27, 2017, the Governor signed the MAUCRSA into law. The provisions of MAUCRSA relevant to this appeal are described in part II.C.5. of this opinion.

In October 2017, the Board adopted Ordinance No. G-8739 (2017 Dispensary Ban Ordinance) by a vote of four to one. KCOC section 19.08.55(A) states its purpose "is to ban commercial medicinal and recreational cannabis businesses and activities of all kinds

that are the subject of the [MAUCRSA] in order to promote the health, safety, and general welfare of the citizens of the County." Any use or any property operated contrary to the 2017 Dispensary Ban Ordinance was "declared to be unlawful and a public nuisance." (KCOC, § 19.08.55(D).)

## PROCEEDINGS

In October 2016, County filed a nuisance abatement action against defendants. County alleged that sometime after May 10, 2016, defendants began operating a marijuana dispensary at the property in Wofford Heights. County alleged defendants' operation of the dispensary violated the moratorium in the KCOC. In March 2017, County's first motion for a preliminary injunction was heard and denied without prejudice. In July 2017, County filed another motion for preliminary injunction to prevent defendants from using the property as a medical marijuana dispensary.

In September 2017, the trial court granted County's motion and issued a preliminary injunction prohibiting defendants from operating the dispensary. In January 2018, after the moratorium was replaced by a ban on dispensaries, the parties stipulated to the dissolution of the preliminary injunction.

In February 2018, County filed a second amended complaint seeking (1) a preliminary and permanent injunction for the abatement of a public nuisance, (2) imposition of civil penalties, and (3) destruction of cannabis. The first cause of action alleged a violation of KCOC section 19.08.055, which bans medical marijuana dispensaries that were not in existence prior to May 10, 2016. The second cause of action alleged a violation of Business and Professions Code section 26038, which states persons operating a dispensary without a license from the Bureau of Cannabis Control are liable for civil penalties up to three times the amount of the license fee for each day of unlicensed operation.

In April 2018, a bench trial was held. The trial court's tentative decision stated County's ordinances were valid and the court would permanently enjoin defendants from

8.

using, or allowing others to use, the property for the operation of a marijuana dispensary No party requested a statement of decision and the trial court did not issue one.

On May 21, 2018, the court entered a judgment setting forth findings and decreeing: "1. The medical marijuana dispensary operating at the Property is declared to be a public nuisance." The judgment's subsequent paragraphs stated the terms of the permanent injunction issued against defendants. Defendants were prohibited from operating a marijuana dispensary on the property and from leasing or otherwise permitting a dispensary to occupy the property. Also, defendants were ordered to remove from the property all signage advertising a marijuana dispensary and not to advertise in any manner the existence of a marijuana dispensary of any kind at the property.

The judgment included the trial court's determination that County was the prevailing party in the action and entitled to seek statutory attorney fees and costs. Based on its finding that the evidence did not establish defendants operated a marijuana dispensary after MAUCRSA's effective date of June 27, 2017, the court determined defendants had not violated the statute. Thus, the judgment stated defendants prevailed on the second cause of action.

In August 2018, the trial court held a hearing on County's motion for attorney fees. The court subsequently filed an order granting the motion and awarding County the $56,477.50 it had requested.

Defendants filed timely notices of appeal from the judgment and the order awarding attorney fees. The parties stipulated to the consolidation of the two appeals.[3]

---

[3] Five other medical marijuana dispensaries have filed appeals challenging the validity of the 2017 Dispensary Ban Ordinance. Those appeals have been assigned case Nos. F079406, F079415, F079418, F079420 and F079422, openings briefs have been filed, and the respondents' briefs are due on March 23, 2020.

## DISCUSSION

I.     BASIC LEGAL PRINCIPLES

    A.     <u>Initiative and Referendum</u>

        *1.     Constitutional Provisions*

Article II, section 1 of the California Constitution addresses political power and the purpose of government by stating: "All political power is inherent in the people. Government is instituted for their protection, security, and benefit, and they have the right to alter or reform it when the public good may require." This text has remained unchanged since the first California Constitution was drafted in 1849. (See Note, *The Limits of Popular Sovereignty: Using the Initiative Power to Control Legislative Procedure* (1986) 74 Cal. L.Rev. 491, 492 (*Popular Sovereignty*); Cal. Const. of 1849, art. I, § 2.)

"Since 1911, California's constitution has provided that 'the people reserve to themselves the powers of initiative and referendum.' " (*Popular Sovereignty*, *supra*, 74 Cal. L.Rev. at p. 492, quoting Cal. Const., art. IV, § 1.)[4] An initiative is distinct from a referendum. (*Jahr v. Casebeer* (1999) 70 Cal.App.4th 1250, 1259.) "The initiative is the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them." (Cal. Const., art. II, § 8, subd. (a).) In contrast, "referendum is the power of the electors to approve or reject statutes or parts of statutes except urgency statutes, statutes calling elections, and statutes providing for tax levies or appropriations for usual current expenses of the State." (Cal. Const., art. II, § 9, subd. (a).) The Legislature's power to amend or repeal a referendum statute is broader than its power to amend or repeal an initiative statute. "The Legislature may amend or repeal a

---

[4]     Article IV, section 1, of the California Constitution reads in full: "The legislative power of this State is vested in the California Legislature which consists of the Senate and Assembly, but the people reserve to themselves the powers of initiative and referendum."

referendum statute." (Cal. Const., art. II, § 10, subd. (c).) In comparison, "[t]he Legislature may amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors unless the initiative statute permits amendment or repeal without the electors' approval." (*Ibid.*) Thus, as part of their initiative power, voters determine whether the Legislature can amend or repeal a particular initiative statute. (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1046, fn. 10.)

The use of initiatives and referenda at the local level is addressed in article II, section 11, of the California Constitution. Subdivision (a) of that section states in full: "Initiative and referendum powers may be exercised by the electors of each city or county under procedures that the Legislature shall provide. Except as provided in subdivisions (b) and (c), this section does not affect a city having a charter."[5]

### 2. Statutory Provisions

The Legislature, pursuant to its authority under article II, section 11, of the California Constitution, enacted statutes addressing the initiative and referendum power for county voters and city voters. Currently, sections 9100 through 9190 address county ordinances and section 9200 through 9295 address city ordinances. Section 9144 addresses the procedure for protesting the adoption of a county ordinance by providing:

> "If a petition protesting the adoption of an ordinance is presented to the board of supervisors prior to the effective date of the ordinance, the ordinance shall be suspended and the supervisors shall reconsider the ordinance. The petition shall be signed by voters of the county equal in number to at least 10 percent of the entire vote cast within the county for all candidates for Governor at the last gubernatorial election." (§ 9144.)

Once a protest petition determined to be valid and the county's board of supervisors has "reconsider[ed] the ordinance" as required by section 9144, the board

---

[5] Subdivisions (b) and (c) of article II, section 11 of the California Constitution are not described in this opinion because they related to initiative measures, not referenda.

11.

must either entirely repeal the ordinance or submit it to the voters. Those two options are set forth in section 9145 as follows:

> "If the board of supervisors does not entirely repeal the ordinance against which a petition is filed, the board shall submit the ordinance to the voters either at the next regularly scheduled county election occurring not less than 88 days after the date of the order, or at a special election called for that purpose not less than 88 days after the date of the order. The ordinance shall not become effective unless and until a majority of the voters voting on the ordinance vote in favor of it." (§ 9145.)

The Legislature has adopted similar provisions for ordinances adopted by cities. Section 9241 addresses how a municipality must respond to a valid protest petition and closely tracks the text of section 9145. However, section 9241 contains an additional sentence explicitly addressing reenactment of the protested ordinance:

> "If the legislative body repeals the ordinance or submits the ordinance to the voters, and a majority of the voters voting on the ordinance do not vote in favor of it, the ordinance shall not again be enacted by the legislative body for a period of one year after the date of its repeal by the legislative body or disapproval by the voters." (§ 9241.)

In 1949, the Legislature passed the bill adding this sentence to the predecessor of section 9241. (Stats. 1949, ch. 194, § 1, p. 426 [Elec. Code, former § 1772].) The amendment may have been motivated by a pending appeal in which the validity of a city ordinance was challenged. In *Gilbert v. Ashley* (1949) 93 Cal.App.2d 414, the plaintiffs argued a city ordinance was void because it substantially reenacted an ordinance defeated by city voters in a referendum election. (*Id*. at pp. 414–415.) The appellate court upheld the judgment dismissing the action, finding "the two ordinances differ from each other in substance relating to items of importance." (*Id*. at p. 415.) As a result, the court did not address how long a city council had to wait before reenacting the essential provisions of a protested ordinance. A few months before the appellate court filed *Gilbert*, the Governor approved the amendment to the predecessor of section 9241.

The legislative history presented by County for the 1949 amendment includes a letter from the general counsel of the League of California Cities to the legislative secretary in the Governor's Office. The letter states the amendment was introduced at the request of the League of California Cities, notes the existing procedures for handling protest petitions, and states: "The question is then raised as to when the local legislative body may again consider such ordinance. The courts have indicated that the legislative body may again consider a similar ordinance after a 'reasonable' period of time. What is a reasonable period of time is never exactly defined but depends on the facts. It may be three months, six months, a year or several years. Most states provide a period of one year, and that is the period provided for by Assembly Bill 1684."[6] The letter asserted the amendment would fix a definite period and avoid the necessity of case-by-case judicial determinations of whether a reasonable time had elapsed.

Nothing in the legislative history submitted by the parties explains why the statute governing city ordinances contains a one-year waiting period and the statute governing county ordinances is silent. Furthermore, nothing in the legislative history for the 1949 amendment even acknowledged the existence of a parallel statutory provision for county ordinances.

### 3. Construction of Statutes Governing Local Referenda

The California Constitution "speaks of the initiative and referendum, not as a right granted the people, but as a power reserved by them." (*Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591.) As a reserved power, courts must jealously guard initiative and referendum. (*DeVita v. County of Napa* (1995) 9 Cal.4th

---

[6]     Defendants contend no California appellate decisions predating the 1949 amendment "describe a time limit on the referendum power, or otherwise dictate that a legislative body may reenact a protested ordinance following a reasonable period of time." County has cited no case showing this contention is incorrect and, instead, argues the letter could have referred to the rulings of trial courts or appellate courts from other jurisdictions.

763, 776.) " '[I]t has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right [to local initiative or referendum] be not improperly annulled.' " (*Associated Home Builders*, *supra*, at p. 591.)

In accordance with these principles, section 9145 " 'should be liberally construed in favor of the power of referendum.' " (*T.C.E.F.*, *supra*, 246 Cal.App.4th at p. 321.) Thus, our consideration of the parties' conflicting statutory constructions examines the practical effect of those interpretations on the referendum power. (*Id.* at p. 320.) Our analysis of section 9145 begins with ascribing its words "their ordinary meaning, while taking account of related provisions and the structure of the relevant statutory and constitutional scheme." (*California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 933.)

### B.     Standard of Review

Defendants' appeal raises an issue of statutory construction and challenges the sufficiency of the evidence for the trial court's findings. Courts "apply independent judgment when construing constitutional and statutory provisions." (*California Cannabis Coalition v. City of Upland*, *supra*, 3 Cal.5th at p. 934; see *T.C.E.F.*, *supra*, 246 Cal.App.4th at p. 316 ["issues of statutory construction are questions of law subject to independent review"].) "The sufficiency of the evidence for a trial court's express or implied [factual] findings is reviewed under the deferential substantial evidence standard." (*T.C.E.F.*, *supra*, 246 Cal.App.4th at p. 316.)

## II.     COUNTY ORDINANCES AND THE REFERENDUM POWER

When an ordinance adopted by a county board of supervisors is challenged by a protest petition and repealed by the board of supervisors, rather than being submitted to the people in a referendum vote, *T.C.E.F.*, *supra*, 246 Cal.App.4th 301 holds the board of supervisors "must not take additional action that has the practical effect of implementing the essential feature of the protested ordinance." (*Id*. at p. 306.) The text of section 9145

14.

and the discussion in *T.C.E.F.* do not address the question presented in this appeal: How long is a board of supervisors barred from taking legislative action that has the practical effect of implementing the essential feature of the protested ordinance?

In discussing the possible answers to this question of statutory interpretation, we use the term "entrenchment" and its variants as shorthand for the limitations an initiative or referendum places on the authority of a legislative body to act contrary to the results of the initiative or referendum process. (See Eule, *Judicial Review of Direct Democracy* (1990) 99 Yale L.J. 1503, 1545, fn. 181.) For example, where a state constitution requires the state legislature to wait two years before amending or repealing a statute adopted by initiative, the statute can be described as "entrenched" for two years. (*Ibid.*)

A.  Possible Interpretations of Section 9145

Before addressing the parties' arguments about the level of entrenchment appropriate for section 9145, we define the range of possible statutory interpretations by identifying the interpretations that mark each end of the spectrum and then describing three interpretations falling on that spectrum.

1.  *No Entrenchment*

At one end of the spectrum, the bar on legislative action has no duration. Under this interpretation, a board of supervisors could "entirely repeal the [protested] ordinance" (§ 9145) at one meeting and readopt the essential feature of that ordinance at its next meeting. The practical equivalent of this interpretation is that there would be no prohibition on post-repeal legislative action. We refer to this possibility as the "no entrenchment" interpretation.

2.  *Strict Entrenchment*

Strict entrenchment establishes the other end of the spectrum of possible interpretations. Under strict entrenchment, the approval of the county's voters is needed to validate a board of supervisors' reenactment of a protested ordinance's essential

15.

feature. In other words, there is permanent bar on *independent* legislative measures. An example of strict entrenchment is provided by California's approach to *initiatives* that obtain voter *approval*. Article II, section 10, subdivision (c) of the California Constitution provides "[t]he Legislature may amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors unless the initiative statute permits amendment or repeal without the electors' approval." (*Ibid*.) The Legislature has placed similar restrictions on the repeal or amendment of county and city initiative ordinances. (§§ 9125 [county initiative ordinances], 9217 [city initiative ordinances].)

### 3. One-Year Restriction

Section 9145 could be interpreted to require boards of supervisors to wait one year before reenacting the essential feature of the protested ordinance. The Legislature adopted this clear, easily administered requirement for cities. Section 9241 states that a protested municipal "ordinance shall not again be enacted by the legislative body for a period of one year after the date of its repeal by the legislative body or disapproval by the voters." The existence of this explicit restriction in section 9241 raises the possibility of interpreting section 9145 to contain a parallel restriction of one year.

### 4. Reasonable Time or Change in Circumstances Restriction

In contrast to the bright-line established by a specific waiting period, section 9145 could be interpreted as allowing post-repeal legislative action only after a reasonable time has passed or a change in circumstances has occurred. County asserts a board of supervisors may act without voter approval when there has been "a significant passage in time and change in circumstances."

### 5. Urgency Exception

Another interpretation would allow a board of supervisors to "adopt as an urgency measure an interim ordinance" that has the practical effect of implementing the essential

feature of the protested ordinance, provided the measure is, in fact, urgent. (See Gov. Code, § 65858, subd. (a); *In re Stratham* (1920) 45 Cal.App. 436, 439–440 [enactment of second ordinance when "there is an emergency involving the immediate safety of the public welfare"].) County contends the moratorium and ban qualify as legitimate urgency measures and, thus, were a valid expression of its police power.

B.      Analysis of Possible Interpretations

With these possible interpretations in mind, we turn to the wording of section 9145. We ascribe to words their ordinary meaning, while taking account of the related provisions and the structure of the relevant statutory and constitutional scheme. (*California Cannabis Coalition v. City of Upland*, *supra*, 3 Cal.5th at p. 933.) First, section 9145 requires boards of supervisors to "entirely repeal the ordinance against which a petition is filed" or "submit the ordinance to the voters." Next, it states: "The ordinance shall not become effective unless and until a majority of the voters voting on the ordinance vote in favor of it." (§ 9145.)

In a letter to counsel, we directed the parties to consider the meaning of the word "ordinance" in section 9145's phrase "[t]he ordinance shall not become effective unless and until …." If "ordinance" is interpreted broadly, the restriction on effectiveness could be read to include a reenactment of the ordinance's essential feature. If interpreted narrowly, it would restrict the effectiveness of the protested ordinance—in this case, the 2011 Dispensary Ban Ordinance—and would not apply to subsequent ordinances. We note the Legislature could have resolved this ambiguity by enacting a sentence that began: "The ordinance *and any reenactment of its essential feature* shall not become effective unless and until …." Alternatively, the Legislature could have used a broader term, such as "measure" and stated the "measure shall not become effective unless and until …." (See Comment, *Legislative Power at Odds: The Effect of a Referendum Petition in Idaho* (2013) 48 Idaho L.Rev. 553, 563 [use of the term "measure" by drafters

17.

of Oklahoma constitutional provision "shows that they intended 'measure' to be determined not by bill numbers but by substance—textual and conceptual similarities"].)

Defendants argue the language of section 9145 is not ambiguous and it prevents the ordinance and any reenactment of the ordinance from becoming effective without voter approval. We conclude the ordinary meaning of the term "ordinance" does not include all subsequent enactments that contain an essential feature of the initial enactment. Therefore, the text does not unambiguously cover subsequent enactments. Rather, the language is susceptible to more than one interpretation. Because of this ambiguity, the text of section 9145 does not plainly contain an express authorization of reenactment or an express prohibition of reenactment. Consequently, we must resolve this ambiguity by deciding what level of entrenchment, if any, should be inferred.

### 1. No Entrenchment

The no entrenchment interpretation of section 9145 is supported by the theory that the Legislature did not expressly include an entrenchment period in section 9145 and, therefore, the judiciary should not insert something the Legislature omitted. (See Code Civ. Proc., § 1858.) We reject the no entrenchment interpretation.

We recognize the constitutional provisions addressing the referendum power directed the Legislature, rather than the courts, to establish procedures for the exercise of that power at the county level. (Cal. Const., art. II, § 11, subd. (a).) However, where the Legislature has not addressed a question of procedure involving the protection of the referendum power, "the courts may properly devise procedures necessary to protect the power." (*Rubalcava v. Martinez* (2007) 158 Cal.App.4th 563, 573 (*Rubalcava*); see *Midway Orchards v. County of Butte* (1990) 220 Cal.App.3d 765, 778–779.) Thus, the Legislature's omission of an entrenchment provision does not tie our hands. We may restrict the authority of boards of supervisors and thereby entrench the referendum power to the extent necessary to protect that power.

18.

On the question of necessary protection, we conclude, as a practical matter, the no entrenchment interpretation would allow a board of supervisors to reenact the repealed ordinance at the meeting immediately following the meeting where the board followed section 9145's directive to "entirely repeal the ordinance." Such a brief period of protection for the referendum power would make the "entirely repeal" requirement a formality providing little substantive protection to the referendum power. As such, the no entrenchment interpretation cannot be regarded as a liberal construction in favor of the power of referendum. (*T.C.E.F.*, *supra*, 246 Cal.App.4th at p. 321.) Stated another way, adopting the no entrenchment interpretation would not fulfill the judiciary's duty to jealously guard (i.e., vigilantly protect) the referendum power of county voters. (See *DeVita v. County of Napa*, *supra*, 9 Cal.4th at p. 776 [duty to jealously guard referendum]; *Rubalcava*, *supra*, 158 Cal.App.4th at p. 573 [courts have vigilantly protected the power of referendum].) Consequently, the no entrenchment interpretation of section 9145 must be rejected.

### 2. Strict Entrenchment

The strict entrenchment interpretation of section 9145 holds a board of supervisors has no authority to ever reenact the essential feature of the protested ordinance without voter approval. A theory underlying this interpretation is that the Legislature did not expressly transfer to boards of supervisors any of the referendum power reserved to the people and, therefore, the judiciary should infer the full scope of the referendum power remained with the people. This theory asserts that, if the Legislature intended to transfer reenactment authority to boards of supervisors, it should have said so, and courts should not insert reenactment authority when the Legislature omitted it. (See Code Civ. Proc., § 1858.)

An argument opposing the strict entrenchment theory is that the Legislature knew how to include strict entrenchment provisions in statutes—for example, sections 9125

19.

and 9217—and chose not to include such a provision in section 9145. Under this argument, the absence of a strict entrenchment provision demonstrates the Legislature did not intend the repeal of an ordinance based on a referendum petition to be protected forever by strict entrenchment.

In view of the conflicting inferences that can be drawn from various principles of statutory construction, we return to the primary goal of statutory interpretation—adopting "the construction that best effectuates the purpose of the law." (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715.) Thus, the strict entrenchment interpretation would be appropriate if it best effectuates the purpose of the constitutional and statutory scheme governing initiative and referendum.

Considering the strict entrenchment interpretation of section 9145 in the context of the constitutional and statutory scheme invites a comparison of the level of protection for county level referendum with the protections provided initiatives approved by county voters. This comparison shows the strict entrenchment interpretation of section 9145 would elevate the protections given to the defeat of an ordinance by referendum to the same level of protection given to a voter-approved initiative. (See § 9125 [amendment or repeal of initiative ordinance].) Accordingly, we consider whether a purpose of California's constitutional and statutory scheme is to provide the same degree of protection to the referendum power as the initiative power.

Viewed as a whole, California's scheme for initiatives and referenda readily demonstrates it is designed to provide greater protection for the initiative process and a lesser degree of protection for referendum. (See *People v. Kelly* (2010) 47 Cal.4th 1008, 1030–1041 [history of initiative and referendum process in California].) One source demonstrating this purpose is article II, section 10, subdivision (c) of the California Constitution, which provides for strict entrenchment when an initiative statute is approved by voters and contains no provision protecting a referendum statute. Indeed, that subdivision states "[t]he Legislature may amend or repeal a referendum statute."

20.

Another factor demonstrating the greater protection given the initiative power is that legislative bodies are prohibited from even proposing initiative measures. (See *People v. Kelly*, *supra*, at p. 1035 [California's version of initiative power is stricter than any other state in that legislative bodies may not *propose* to voters that an initiative measure be repealed or amended].)

Another relevant comparison is the restrictions placed on legislative bodies when voters have *approved* a measure versus the restrictions that arise when voters have *rejected* a measure. One reason for the distinction is that a voter *approval* plainly demonstrates the electorate's intent for specific provisions to go into effect. In contrast, the disapproval of a measure may result from a combination of disparate voter opinions. Some voting "no" may believe the measure does too little, while others may believe it does too much.

One commentator has adopted the view that defeated measures should not be provided the same protection as measures approved by the voters. (Note, *The Scope of the Initiative and Referendum in California* (1966) 54 Cal. L.Rev. 1717, 1744–1745.) The commentator noted constitutional provisions explicitly eliminate the danger of a subsequent legislative act vitiating the will of the state's voters when the initiative has been *approved* by the voters and declared the danger also exists when an initiative is *defeated* by the voters. The commentator then stated: "When an initiative is defeated at the polls, the question may arise whether the legislature can subsequently enact essentially the same law. Although the issue has apparently not been presented, the legislature should be free to do so—without having any special burden of showing changed conditions which might indicate the public would now vote differently. Any other rule might seriously hamstring the legislature and attribute too much meaning to the negative popular vote." (*Id*. at p. 1745.)

The commentator's view is compatible with our Supreme Court's discussion of the defeat of a referendum:

"Since its inception, the right of the people to express their collective will through the power of the referendum has been vigilantly protected by the courts. Thus, it has been held that legislative bodies cannot nullify this power by voting to enact a law identical to a *recently rejected* referendum measure. (See *Gilbert v. Ashley* (1949) 93 Cal.App.2d 414, 415–416 [209 P.2d 50]; *In re Stratham* (1920) 45 Cal.App. 436, 439–440 [187 P. 986].) Unless the new measure is 'essentially different' from the rejected provision and is enacted 'not in bad faith, and not with intent to evade the effect of the referendum petition,' it is invalid. (*Id.*, at p. 440; see also *Reagan v. City of Sausalito* (1962) 210 Cal.App.2d 618, 629–631 [26 Cal.Rptr. 775]; *Martin v. Smith* (1959) 176 Cal.App.2d 115, 118–119 [1 Cal.Rptr. 307].) Should the referenda *here* be rejected in the primary election, the Legislature will be governed by these rules in fashioning new reapportionment plans for the *remainder of this decade*." (*Assembly v. Deukmejian* (1982) 30 Cal.3d 638, 678, italics added.)

This discussion shows the Supreme Court did not adopt strict entrenchment when a statewide referendum is defeated. We have identified nothing in the court's analysis or in the arguments presented here that supports giving more protection to the defeat of a *county* measure than is provided the defeat of a *statewide* referendum.

Based on the overall scheme for initiatives and referenda and various comparisons that can be made, we conclude strict entrenchment is not appropriate when the referendum process defeats a county ordinance. A strict entrenchment interpretation of section 9145 would not fit harmoniously within the constitutional and statutory scheme for initiative and referendum. Instead, it would elevate the protection resulting from the repeal of a county ordinance after submission of a protest petition to coincide with the protection given initiative ordinances passed by the voters.

### 3. One-Year Restriction

We summarily reject the idea of importing the one-year restriction of section 9241 into section 9145. Bright-line rules are arbitrary, and we conclude an arbitrary time limit is not the best way to provide effective protection for the referendum power.

### 4.	*Material Change in Circumstances Restriction*

Having rejected the no entrenchment and strict entrenchment interpretations, what remains is choosing an interpretation of section 9145 that lies somewhere on the spectrum between those two interpretations.  Based on the structure of the constitutional and statutory scheme for initiative and referendum, the history of that scheme available in case law, the legislative history presented by the parties, and the judicial decisions addressing other issues about the application of the particular aspects of the scheme, we conclude that the proper level of entrenchment is achieved by requiring a material change in circumstances before county boards of supervisors may reenact the essential feature of an ordinance repealed after submission of a protest petition.

First, a material-change-in-circumstances restriction is compatible with statements made by our Supreme Court.  In *Assembly v. Deukmejian*, *supra*, 30 Cal.3d 638, the court acknowledged earlier decisions holding "that legislative bodies cannot nullify [the referendum] power by voting to enact a law identical to a *recently rejected* referendum measure."  (*Id*. at p. 678, italics added.)  As guidance, the court stated:  "Should the [reapportionment] referenda *here* be rejected in the primary election, the Legislature will be governed by these rules in fashioning new reapportionment plans for the *remainder of this decade*."  (*Ibid*., italics added.)  The language about the "remainder of this decade" refers to the fact that apportioning areas to voting districts are based on population and the federal census is conducted every decade.  The court's statements can be interpreted as implying that the material circumstances relevant to reapportionment would not change until a new federal census was released.  Therefore, we conclude *Assembly v. Deukmejian* supports interpreting section 9145 to mean a material change in circumstances is required before county boards of supervisors may reenact the essential feature of an ordinance repealed after submission of a protest petition.

Second, a material-change-in-circumstances restriction avoids the arbitrariness of a bright-line rule based solely on the passage of time. It also avoids the shortcomings of the no entrenchment and strict entrenchment interpretations discussed earlier.

Third, a material-change-in-circumstances restriction fulfills our duty to vigilantly protect the referendum power of county voters. (See *Rubalcava*, *supra*, 158 Cal.App.4th at p. 573.) We do not equate vigilant protection with expanding the referendum power so it restricts legislative bodies to the same degree as the initiative power. The two powers are distinct and the protections necessary to each must recognize that distinction.

### 5. *Other Legal Issues*

The adoption of a material-change-in-circumstances restriction raises other legal questions. First, we define the term "material." The ordinary meaning of the adjective "material" is "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential." (Black's Law Dict. (8th ed. 2004) p. 998.) We conclude this definition, with the addition of an objective standard, is appropriate for a restriction protecting the referendum power. Thus, whether the change in circumstances amounts to a material change is determined by considering the effect on the decision-making of an objectively reasonable person. If an objectively reasonable person would consider the new circumstances significant or important in making a decision about the subject matter of the ordinance, the change in circumstances is material.

Second, we consider the appropriate scope of inquiry—that is, which circumstances should be considered in determining whether a material change has occurred. One possibility is to identify specific factors or indicia and limit the inquiry to those factors. (E.g. *Ayala v. Antelope Valley Newspaper, Inc.* (2014) 59 Cal.4th 522, 531–532 [identifying the primary factor and eight secondary indicia in the test for an employment relationship].) Another possibility it to require an evaluation of the totality of the circumstances, which would require the court to determine the relevancy of a

24.

particular change and its weight on a case-by-case basis. In *T.C.E.F.*, this court concluded "the totality of the circumstances" is the proper scope of inquiry for analyzing the "practical effect" of the board of supervisor's additional action on the subject matter of the protested ordinance. (*T.C.E.F.*, *supra*, 246 Cal.App.4th at p. 323.) Here, we conclude the totality of the circumstances properly defines the scope of the inquiry into changes that have occurred since the defeat of a measure through the referendum process. A danger of creating a laundry list of relevant factors is that the list might exclude circumstances of significance in subsequent cases. This danger is avoided by the flexibility of the totality of the circumstances test. We conclude the benefits of flexibility outweigh the onus this test places on the judiciary, as trial and appellate courts are experienced in determining which circumstances are relevant to a particular issue. (See Evid. Code, §§ 210 [relevant evidence], 350 [only relevant evidence admissible], 351 [all relevant evidence is admissible].) Accordingly, the totality of the circumstances is the appropriate scope of inquiry when a court evaluates whether there has been a material change in circumstances.

Third, we consider the legal question of who has the burden of proving a material change in circumstances occurred or did not occur. Evidence Code section 500 normally allocates the burden of proof as to the existence or nonexistence of facts to the party asserting a claim or defense to which the facts are essential. Here, even if we assume the nonexistence of a material change in circumstances is essential to the defense in this case, we conclude the burden of proof should be allocated to County. (See *Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1188 [allocation of burden].) This allocation is based on (1) a county's superior knowledge of the reasons the board of supervisors adopted the ordinance in question, (2) a county's ability to marshal evidence about the changed circumstances underlying the board's action, (3) the most desirable result in terms of public policy in the absence of proof of a material change in circumstances, and (4) the probability of the existence or nonexistence of a change in circumstances. (See

25.

*Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 660–661.) As to the public policy factor, it favors allocating the burden to counties because the referendum power is reserved to the people and the constitutional and statutory scheme should be liberally construed in favor of the power of referendum. (*Associated Home Builders etc., Inc. v. City of Livermore*, *supra*, 18 Cal.3d at p. 591; *T.C.E.F.*, *supra*, 246 Cal.App.4th at p. 321.) In short, if a board of supervisors wishes to act against the will of county voters expressed in a referendum petition, it bears the responsibility of establishing a sound factual basis for its action.

  C. <u>Evaluation of the Changed Circumstances</u>

  Our evaluation of whether County presented sufficient evidence to carry its burden of establishing a material change in circumstances relating to marijuana dispensaries begins by defining the period during which the changes must have occurred. The baseline conditions are those existing in February 2012 when the Board repealed the 2011 Ban Ordinance. The date the protest petition was submitted is not the appropriate baseline because the events after that date and before the repeal would have informed the Board's decision whether to repeal the ordinance or place it on the ballot. The end of the period is easily identified as May 10, 2016—the date the Board passed the moratorium on new dispensaries. Thus, to be relevant to the adoption of the moratorium, the changes must have occurred during the four years and three months between February 2012 and May 2016. Similarly, the relevant period for the October 2017 adoption of the ban on dispensaries is from February 2012 to October 2017.

  1. *Composition of the Board*

  In addition to information bearing directly on the merits of an ordinance, we conclude information showing a shift in voter attitudes on the subject matter is relevant to whether a board of supervisors is justified in reenacting the essential feature of an ordinance repealed after the submission of a protest petition. Here, the June 2012

primary election and November 2012 general election placed three new members on the County's Board of Supervisors. As a result, only two members who voted on the 2011 Ban Ordinance and the February 2012 repeal of that ordinance remained on the Board of Supervisors during the relevant interval.

In the circumstances of this case, the changes in the legislative body attempting to reenact a feature of an ordinance challenged by a protest petition does not strongly support the inference that the political climate and voter views have changed. Measure G was approved by 69 percent of the voters at the June 2012 primary election. During the primary election, two new members obtained a majority of votes cast and avoided a runoff election in the fall. The third new member received enough votes in the primary to qualify for the runoff and was elected at the November 2012 general election. Because all new members of the Board received votes in the same election where voters approved Measure G by a wide majority, the 2012 election of the new members provides little support for a change in voter attitude towards marijuana dispensaries.

The record contains little information about the 2014 reelection of two members who were on the Board in February 2012 when the 2011 Dispensary Ban Ordinance was repealed. Thus, there is an insufficient basis for inferring their reelection signals a change in voter attitude towards marijuana dispensaries. The 2016 election occurred after the Board adopted the moratorium and, therefore, the results of that election could not have been relied upon by the Board as demonstrating a change in circumstances. The reelection of Board members who passed the moratorium might be viewed as voter affirmation of that decision, but the record contains too little information about the election to rationally draw that inference. In summary, the results of elections occurring during and shortly after the relevant period are insufficient to carry County's burden of establishing a material change in circumstances.

## 2. *Legal Landscape*

County asserts several changes in the legal landscape occurred after February 2012. The California Supreme Court decided *City of Riverside v. Inland Empire Patients Health & Wellness Center, Inc.* (2013) 56 Cal.4th 729 and held local government's authority to ban marijuana dispensaries was not preempted by the Compassionate Use Act of 1996 (Health & Saf. Code, § 11362.5) or the Medical Marijuana Program (Health & Saf. Code, § 11362.7 et seq.) The decision in *Riverside* did not establish a new rule of law, but removed some uncertainty by confirming Court of Appeal decisions that recognized the authority of local governments to ban dispensaries. (See *City of Claremont v. Kruse* (2009) 177 Cal.App.4th 1153, 1176 [city's moratorium on medical marijuana dispensaries did not conflict with state statutes]; *City of Corona v. Naulls, supra,* 166 Cal.App.4th 418 [medical marijuana dispensary's failure to obtain planning commission approval violated municipal code; dispensary created a nuisance per se].)

In 2015, the Legislature enacted the Medical Marijuana Regulation and Safety Act for the licensure and regulation of medical marijuana. (Bus. & Prof. Code, former § 19300 et seq.; Stats. 2015, ch. 689, § 4.) Business and Professions Code former section 19315, subdivision (a) stated nothing in the new legislation superseded or limited existing local authority, including the enforcement of local zoning, permit or licensing requirements.

We conclude the decision in *Riverside* and the enactment of the Medical Marijuana Regulation and Safety Act, by themselves, do not constitute a material change in circumstances relevant to county level regulation of marijuana dispensaries. In practical effect, they did not significantly alter the authority of boards of supervisors to regulate or ban marijuana dispensaries and did not signal a material shift in state policy towards local regulation of dispensaries.

28.

### 3. *Information of Marijuana Use and Related Concerns*

On May 10, 2016, when the Board adopted Ordinance No. G-8630 with its moratorium on new dispensaries, the Board included findings about information that had not been available earlier. First, the Board of Supervisors found that since 2014 there had been a proliferation of new medical marijuana dispensaries even though County's zoning ordinance did not permit such a property use and there had been an increase in enforcement efforts and the expenditure of public resources because of the new dispensaries. Second, a federally commissioned study published in September 2015, addressing the impact of marijuana legalization in Colorado concluded (1) marijuana-related traffic deaths increased 92 percent between 2010 and 2014, (2) marijuana use among youth ages 12 to 17 had increased, (3) marijuana-related hospitalization increased by 46 percent over a three-year period, and (4) instances of marijuana ingestion by children under 12 increased from two in 2009 to 16 in 2014. Third, information showed that in 2009 approximately 17 percent of Denver marijuana retail shops had been robbed or burglarized within the preceding 12 months and that rate had increased to 50 percent by 2014. Fourth, a 2013 report stated nearly one-third of the crimes committed in Denver occurred within 1,000 feet of a marijuana dispensary. Fifth, the reports about criminal activity in Colorado were consistent with the findings of the California Police Chiefs Association's Task Force on Marijuana Dispensaries issued in 2009. Sixth, a Kern County Sheriff's Department report for the period of April 1, 2015, through March 31, 2016, found marijuana dispensaries averaged four calls for service, with call volume ranging from 27 to zero and burglary being the most commonly reported crime. For that one-year period, the report also identified the number of reports of criminal activity within 660 feet of a dispensary.

In October 2015, the Board of Supervisors requested staff to study the imposition of a ban on medical marijuana dispensaries and the cultivation or delivery of medical marijuana. Subsequently, the study was expanded to consider alternatives to a ban.

### 4. *Materiality of Changes Preceding the Moratorium*

In May 2016 when the Board adopted the moratorium on new dispensaries, it had information that it did not have in February 2012. That information included the occurrence of criminal activity at or near the dispensary, traffic safety, underage use of marijuana, and hospitalization related to marijuana use. Viewing this additional information from the objectively reasonable person standard, we conclude a material change in circumstances occurred after the 2011 Ban Ordinance was repealed because of the protest petition and before the May 2016 adoption of the moratorium on new dispensaries. Therefore, we conclude the protest petition and subsequent repeal of the 2011 Ban Ordinance no longer barred the Board from enacting the moratorium.

### 5. *Materiality of Changes Before the Ban and Phase-Out*

Additional changes in the regulation of marijuana occurred after the Board enacted and extended the moratorium on new dispensaries. On November 8, 2016, California voters passed as an initiative measure the Control, Regulate and Tax Adult Use of Marijuana Act, more commonly known as Proposition 64. (*People v. Boatwright* (2019) 36 Cal.App.5th 848, 853.) Proposition 64 legalized adult, recreational use of marijuana and reduced the criminal penalties for various offenses involving marijuana, including its cultivation and possession for sale. (*Boatwright*, *supra*, at p. 853.)

After the passage of Proposition 64, the Governor signed into law MAUCRSA. MAUCRSA repealed the Medical Marijuana Regulation and Safety Act enacted in 2015; created one regulatory system for both medicinal and adult-use (i.e., recreational) cannabis; and became effective on June 27, 2017. The new act explicitly authorized local jurisdictions "to completely prohibit the establishment or operation of one or more types of businesses licensed under [MAUCRSA] within the local jurisdiction." (Bus. & Prof. Code, § 26200, subd. (a)(1).) To assist the implementation of the choices made by local governments, MAUCRSA provides that no application for a state license shall be

approved if that approval "will violate the provisions of any local ordinance or regulation adopted in accordance with Section 26200." (Bus. & Prof. Code, § 26055, subd. (d).)

The trial court's tentative ruling stated that the enactment of the Medical Marijuana Regulation and Safety Act in 2015, the passage of Proposition 64 in 2016, and the enactment of MAUCRSA in 2017 "constitute changed circumstances giving rise to cause for County to reconsider and reexamine the[] issues" relating to marijuana dispensaries. This finding was not restated in the "FINDINGS" section of the subsequently filed judgment, but we treat it as implied.

Our review of the changes preceding the Board's October 2017 adoption of the ban dispensaries takes into account the passage of Proposition 64 and subsequent enactment of MAUCRSA in addition to the changes that occurred prior to the adoption and extension of moratorium. Regardless of whether those changes are reviewed independently or under the substantial evidence standard, we conclude the totality of the changes constituted a material change relevant to County's regulation of marijuana dispensaries. The legalization of recreational use of marijuana greatly increased the potential demand and, thus, the number of dispensaries that might open if authorized. In turn, the Board could reasonably infer a larger number of dispensaries would increase the volume of criminal activity, traffic incidents and hospitalizations involving marijuana. Consequently, we conclude material changes occurred before the Board enacted Ordinance No. G-8739 banning new marijuana dispensaries and phasing out existing dispensaries.

In summary, the ordinances upon which the permanent injunction was based did not violate section 9145. Consequently, the injunction cannot be reversed on the ground the ordinances were invalid.

31.

III.    INTENT TO VIOLATE THE BAN ON DISPENSARIES*

      A.      <u>Legal Standard for Injunction</u>

The parties have relied on *Epstein v. Superior Court* (2011) 193 Cal.App.4th 1405 (*Epstein*) as setting forth the legal standard governing the issuance of an injunction.  In that case, the court stated the issuance of an injunction requires "a substantial basis to suppose that the defendant, if not restrained, will *actually engage* in the conduct sought to be enjoined.  Such an injunction 'cannot issue in a vacuum based on the proponents' fears about something that may happen in the future.  It must be supported by actual evidence that there is a realistic prospect that the party enjoined intends to engage in the prohibited activity.'  [Citations.]" (*Id*. at p. 1410.)  Thus, the record must demonstrate a reasonable probability or a realistic prospect that the activity to be enjoined is impending and threatened.  (*Ibid*.)  The court noted "a defendant cannot automatically negate a threat that otherwise appears merely by disclaiming the present intention to carry it out." (*Ibid*.)

      B.      <u>Trial Court's Decision</u>

          *1.      Findings of Fact*

The trial court's judgment included a section labeled "FINDINGS."  The court found defendants had been involved in the operation of a marijuana dispensary at an address in Wofford Heights, which did not begin operating until after May 10, 2016.  Addressing the duration of the operations, the court found "[t]here is not substantial evidence to establish that Defendants were operating a dispensary at the property after June 27, 2017."  Despite the court's findings about when operations began and were discontinued, the court used the present tense when it found:  "A public nuisance is found to exist on the subject property due to Defendants' violations of G-8630 and Chapter 5.86 of the KCOC, later codified in G-8739 and section 19.08.055."  The court addressed what was likely to happen in the future by stating:  "Unless enjoined, a public nuisance will

---

*      See footnote, *ante,* page 1.

occur on the subject property because Defendants are attempting to reopen a medical marijuana dispensary in violation of Kern County Ordinances G-8739 and 19.08.055." Because the trial court was aware of the principles stated in *Epstein*, *supra*, 193 Cal.App.4th 1405, we interpret its decision to include an implied finding " 'that there is a realistic prospect that [defendants] intend[] to engage in the prohibited activity' " in the future. (*Id*. at p. 1410.)

### 2. *Terms of the Injunction*

The trial court's judgment decreed that "[t]he medical marijuana dispensary operating at the Property is declared to be a public nuisance." Like the court's finding that a "public nuisance is found to exist on the subject property," this determination is stated in the present tense, which contradicts the court's specific finding about when the dispensary began and ended its operations.

The judgment contains the terms of the permanent injunction, which prohibit defendants and any successors in interest from (1) renting, leasing or otherwise permitting any marijuana dispensary to occupy or remain on the property, (2) using any property in Kern County to operate a dispensary, (3) selling, giving away or otherwise distributing marijuana from the property, or (4) advertising the existence of a dispensary at the property. In addition, the injunction required defendants to remove from the property all signage advertising a cannabis dispensary and to advise persons entering the property that the dispensary was closed. The court expressly retained jurisdiction to enforce compliance with the injunction.

### C. Contentions of the Parties

Defendants contend the trial court's express finding that the evidence did not establish they were operating a dispensary at the property after June 27, 2017, cannot be reconciled with any implied finding that they intended to reopen the dispensary and operate it in violation of the 2017 Dispensary Ban Ordinance. In addition, defendants

33.

contend (1) an implied finding of intent to reopen cannot be reconciled with the judgment in their favor on the second cause of action seeking civil penalties for violating Business and Professions Code section 26038; (2) the finding about the existence of a public nuisance conflicts with the express finding that no operations occurred after June 27, 2017, as no violation of law existed when the judgment was entered; (3) substantial evidence does not support the implied findings they intended to violate the ban; and (4) the pending state license application and the existing seller's permit shows they intended to follow the law, not violate it.

County argues substantial evidence supports the trial court's issuance of the permanent injunction to prevent the continued operation of the dispensary. County asserts it is not accurate to describe the cessation of operations as voluntary or in good faith because the trial court issued a preliminary injunction in September 2017. County interprets the evidence offered at trial as demonstrating that, after the stipulated dissolution of the preliminary injunction, defendants made a concerted effort to restart dispensary operations.

D. Internal Consistency of the Judgment

We conclude the judgment's express finding that "[a] public nuisance is found to exist on the subject property" is inconsistent with the specific finding that no operations occurred after June 27, 2017. If the specific finding is given effect, it necessarily establishes no public nuisance in the form of a marijuana dispensary existed when the trial was conducted. Therefore, the finding that "[a] public nuisance is found to exist on the subject property" and the related decree that "[t]he medical marijuana dispensary operating at the Property is declared to be a public nuisance"—both of which use the present tense—are not consistent with the finding that identifies a specific date after which no dispensary operations occurred on the property. To resolve this inconsistency, we resort to the principles for the construction of written instruments. (See *Verner v.*

34.

*Verner* (1978) 77 Cal.App.3d 718, 724 [meaning of a judgment is determined under rules governing the interpretation of writings generally].) One such principle states that when construing an instrument, "a particular intent will control over a general one that is inconsistent with it." (Code Civ. Proc., § 1859; see *Iqbal v. Ziadeh* (2017) 10 Cal.App.5th 1, 12 [where general and specific provisions are inconsistent, the specific provision controls].) Applying this principle, we conclude the finding that "[t]here is not substantial evidence to establish that Defendants were operating a dispensary at the property after June 27, 2017" controls because it provides a specific date. Therefore, the judgment will be modified to comport with the finding that no operations occurred after June 27, 2017. (See generally, Code Civ. Proc., §§ 43 [courts of appeal may modify any judgment appealed from], 906 [reviewing court may modify any judgment and may direct the proper judgment be entered].)

We reject defendants' contention that any implied finding that they intended to reopen the dispensary and operate it in violation of the 2017 Dispensary Ban Ordinance cannot be reconciled with (1) the specific finding that the evidence did not establish defendant operated a dispensary at the property after June 27, 2017, or (2) the judgment in their favor on the second cause of action seeking civil penalties for violations of Business and Professions Code section 26038. While the determination that defendants were not violating the statute by operating a dispensary tends to support a finding that they did not intend violating the statute in the future, it does not conclusively establish the absence of any intent. In analyzing the claim of inconsistency, we conclude the appropriate test is adapted from the one used for special verdicts. That test requires there be no possibility of reconciling the answers in the special verdicts with each other. (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357.) Under this test, courts evaluate whether there is *any* possibility of reconciliation under any possible application of the evidence and the jury instructions. (*Lambert v. General Motors* (1998) 67 Cal.App.4th 1179, 1183.) As modified for the findings and judgment after a bench

35.

trial, we conclude an appellate court must evaluate whether there is *any* possibility of reconciling the court's findings under any possible application of the correct rules of law to the evidence. Applying this test for consistency, we conclude it is possible for a person to comply with the law during the present while harboring an intent to violate the law in the future. Thus, the findings challenged by defendants are not irreconcilable.

E.     Analysis of the Evidence About Intent

Defendants also contend that the implied findings that they intended to violate the dispensary ban is not supported by substantial evidence. The inquiry into the existence of substantial evidence encompasses the specific issue of what inferences about defendants' intent can be reasonably drawn from Jamieson's license application pending with the Bureau of Cannabis Control at the time of trial.

From a chronological perspective, the first acts or omissions by defendant that show a willingness to violate County's ordinance are contained in the trial court's findings that defendants operated a marijuana dispensary at the property in violation of County's moratorium. The dispensary operations began after May 10, 2016, and ended before June 27, 2017. This finding shows that during one period defendants were willing to violate provisions in the KCOC, at least while they contested the validity of the ordinances. We conclude this willingness, standing alone, is an insufficient basis for inferring an intent to operate a dispensary in the future in violation of the county ordinances, which necessarily would involve violating the state licensing requirement. Additional evidence is needed because defendants' operation of the dispensary was based on their belief that the ordinances containing the moratorium and ban were invalid. As the litigation of the validity of the ordinances progressed, defendants ceased operations. Accordingly, our analysis turns to the evidence explaining why the operations ceased.

Defendants' operations ended before June 27, 2017, the date MAUCRSA became effective. Thus, defendants did not violate that statute. The trial court concluded no

36.

violation of MAUCRSA had been established. As a result, defendants prevailed on the second cause of action, which sought civil penalties under that statute. Consequently, the evidence did not show defendants' willingness to violate the requirements of state law and incur the consequences of such a violation. Those consequences include "civil penalties of up to three times the amount of the license fee for each violation" plus "the cost of the destruction of cannabis associated with [the] violation." (Bus. & Prof. Code, § 26038, subd. (a).) Under this provision, each day of operation constitutes a separate violation. (*Ibid.*; see Cal. Code Regs., tit. 16, § 5014 [licensing fees].)

County argues defendants' cessation of the nuisance activity was the result of their temporary compliance with the preliminary injunction issued by the trial court and it does not demonstrate defendants' good faith. Based on a review of the timing of the relevant events, we disagree. Defendants ceased operations before June 27, 2017. As described earlier, (1) the trial court denied County's first motion for a preliminary injunction in March 2017; (2) County filed another motion for preliminary injunction in July 2017; and (3) the trial court granted the motion in September 2017. These dates show defendants' operation of the dispensary ended before the preliminary injunction was issued and even before County filed the motion for preliminary injunction that eventually was successful. Thus, the timing of the motion and the order granting the preliminary injunction does not reasonably support the inference that those events motivated or caused defendants to cease dispensary operations.[7]

Fourth, County contends defendants "sought an order from the trial court allowing them to pursue a state license to continue the operation of [the] dispensary, an attempted

---

**7**    It is generally accepted that a cause and effect relationship requires a temporal sequence where the cause occurs before the effect. Also, this sequence, standing alone, in not enough to establish the relationship. (See *Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 393–394 [more than post hoc, ergo propter hoc (i.e., after this, therefore because of this) must be demonstrated to establish causation].)

end run of the County's regulation ban on commercial medicinal cannabis." County supported this contention by citing pages 160 and 161 of the reporter's transcript from the first day of the bench trial. On that day, defendants' motion to dismiss for lack of jurisdiction was addressed before witnesses were called. The court stated the rationale for its tentative to deny the motion, including that "[t]his is not a proceeding based on the State's action or lack of action in approving or not approving an application for a state license" and the statutory scheme clearly delegated local jurisdictions the authority to regulate (including banning) the operation of dispensaries. Jamieson requested permission to argue on behalf of his client, ASHES, and asserted the court lacked the power to hear the controversy "because the legislature has delegated the licensing authority to the B[ureau] of Cannabis Control and the executive branch." The court responded: "But this is not litigation over the licensing application." Jamieson argued that, if matters were decided in the proper sequence, the court could not "hold we are operating a dispensary illegally until the sole licensing authority has made a ruling on whether we're entitled to a license or not. We filed our application." In Jamieson's view, if ASHES was operating a dispensary in violation of County ordinances, that would be something to raise before the Bureau of Cannabis Control and it would be the Bureau's decision whether or not he had local authority.[8] The court disagreed with Jamieson's view of the relative authority of the Bureau and the court. Jamieson then raised his concern that the procedural posture of the litigation would prevent him from exhausting his administrative remedies with the state agency.

---

**8**     Presumably, Jamieson's theory was that the 2009 Ordinance provided local authorization for the dispensary. Under this theory, the 2009 Ordinance remained in effect because the most recent (i.e., post-*T.C.E.F.*) attempts by the Board to repeal or override the 2009 Ordinance—specifically, the May 2016 moratorium, the subsequent extensions of the moratorium, and the October 2017 ban—were invalid because they violated section 9145 and the referendum power.

38.

Using the statements made by Jamieson in his capacity as the attorney representing ASHES as evidence of an intent to violate the ban on dispensaries in the future raises at least two difficulties. The principles in *Epstein*, *supra*, 193 Cal.App.4th at page 1410 referred to "actual evidence." As a general rule, courts "give no weight to counsel's statements, as arguments by counsel are not evidence." (*South Sutter, LLC v. LJ Sutter Partners, L.P.* (2011) 193 Cal.App.4th 634, 668, fn. 14; *Gdowski v. Gdowski* (2009) 175 Cal.App.4th 128, 139 ["Statements and arguments by counsel are not evidence"].) Accepting Jamieson's statement that "[w]e filed our application" as a judicial admission (i.e., an unequivocal concession) and, therefore, an established fact, the existence of a pending license application does not reasonably support a finding that " 'that there is a realistic prospect that [defendants] intend[] to engage in the prohibited activity' " (*Epstein*, *supra*, at p. 1410)—namely, the operation of an unlicensed marijuana dispensary. Rather, the conceded fact of a pending application coupled with the absence of current operations supports the inference that defendants intended to operate a marijuana dispensary if they were able to obtain a state license authorizing the operation. Simply put, applying for a state license is not evidence of an intent to operate without a state license and a state license would not be issued without local authorization.

Next, we consider County's contention that Jamieson's argument that County did not have the authority to regulate marijuana activity was both wrong and illustrative of defendants' intent. As previously stated, arguments by counsel are not evidence and, thus, do not constitute substantial evidence supporting a finding about defendants' intent.

County also contends "[e]vidence at trial revealed that soon after the stipulated dissolution of the preliminary injunction, [defendants] made a concerted effort to restart the operation of the dispensary at the Property." County cited the testimony of Lorelei Oviatt, the director of the Kern County Planning and Natural Resources Department. Oviatt is County's designee for receiving requests and notifications from the Bureau of Cannabis Control and she reported County's ordinance on marijuana to the state.

39.

According to Oviatt's testimony, when the Bureau receives an application for a license for a location in Kern County, it sends her an email asking whether the applicant in question has gotten legal clearance or a land use clearance from County. Oviatt testified that on April 2, 2018, she received a request from the licensing manager for the Bureau of Cannabis Control for information about ASHES 1, LLC, which had applied for an annual state cannabis medicinal use retailer license for the property in Wofford Heights. Oviatt was asked to confirm the applicant was authorized to conduct the commercial cannabis activity for which the license was requested. Oviatt sent a letter stating there was no authorization or permit for cannabis-related activity at the location.

Oviatt's testimony duplicates Jamieson's judicial admission of the fact that "[w]e filed our application" and provides additional details about the processing of the application. As previously stated, the fact Jamieson had a license application pending is indicative of an intent to operate a dispensary after the license is obtained, not an intent to operate an unlicensed dispensary in violation of state law and the KCOC. The possibility that defendants might obtain a state license to operate a dispensary despite County's ban need not be analyzed because (1) the evidence does not establish that is a realistic possibility and (2) the issuance of such a license would be contrary to the terms of MAUCRSA. (Bus. & Prof. Code, § 26055, subd. (d); see Bus. & Prof. Code, § 26200, subd. (a)(1) [authority of local jurisdiction to completely prohibit dispensaries].)

Lastly, we consider defendants' aggressive assertions throughout this litigation that County could not bar their operation of a dispensary because, among other things, County's moratorium and subsequent ban were invalid infringements on the referendum power and contrary to (or at least inconsistent with) the principles set forth in *T.C.E.F.*, *supra*, 246 Cal.App.4th 301. Defendants' challenges to the validity of the moratorium and subsequent ban on dispensaries satisfy an objective standard of reasonableness more stringent than the standard used for awarding sanctions under Code of Civil Procedure section 128.5. Attorneys who have pursued frivolous actions or tactics may be subject to

40.

sanction if, under an objectively reasonable attorney standard, the tactic or action is determined to be totally and completely without merit. (*San Diegans for Open Government v. City of San Diego* (2016) 247 Cal.App.4th 1306, 1319; Code Civ. Proc., § 128.5, subd. (b)(2).) Here, we conclude defendants' proposed interpretation of section 9145 had a reasonable probability of success and, therefore, defendants asserted that interpretation in good faith. Stated another way, defendants reasonably anticipated winning the dispute about the proper interpretation of section 9145 and the validity of the moratorium and ban on dispensaries. As a result, it also was reasonable for defendants to take action to prepare for winning that dispute, such as Jamieson's formation of ASHES 1, LLC and submission of an application for a license to the Bureau of Cannabis Control in April 2018. Had defendants won and had the 2009 Ordinance been declared to still be in effect, Jamieson had the paperwork started for obtaining a state license for a dispensary. Being prepared for victory in litigation is not evidence of an intent to violate the state licensing requirement and local ordinances if the litigation is lost.

In summary, we conclude substantial evidence does not support a finding that "defendant[s], if not restrained, will *actually engage* in the conduct sought to be enjoined." (*Epstein*, *supra*, 193 Cal.App.4th at p. 1410.) Such a finding " 'must be supported by actual evidence that there is a realistic prospect that the party enjoined intends to engage in the prohibited activity.' [Citations.]" (*Id*. at p. 1410.) Here, the record does not contain actual evidence demonstrating a reasonable probability or a realistic prospect that defendants would operate a marijuana dispensary and incur the monetary and other penalties imposed for violations of MAUCRSA and County's ordinances. Accordingly, the portion of the judgment containing the permanent injunction must be reversed.

IV.    ATTORNEY FEES*

Based on the modification of the findings in the judgment about when the public nuisance existed and the reversal of the grant of the permanent injunction, the trial court's determinations that County was the prevailing party for purposes of recovering costs and seeking attorney fees must be vacated.  Similarly, the September 19, 2018, order granting County's motion for attorney fees and costs in the amount of $56,477.50 must be reversed.  Furthermore, the determination that County was the prevailing party on the first cause of action must be vacated and that issue must be remanded to the trial court for a new determination in light of the outcome of this appeal.  (See *De Anza Cruz Mobile Estates Homeowners Assn. v. De Anza Santa Cruz Mobile Estates* (2001) 94 Cal.App.4th 890, 902 [after reversal of judgment and post-judgment order awarding attorney fees, trial court directed to determine on remand which party, if any, was the prevailing party].)

The appellate briefing did not address the question of attorney fees incurred on appeal.  Based on the lack of argument and the open question of which party prevailed in the proceedings below, we do not consider appellate attorney fees.  (Cf. *City of Oakland v. McCullough* (1996) 46 Cal.App.4th 1, 10 [appellate court exercised its discretion and ordered parties to bear their own appellate attorney fees].)

### DISPOSITION

The May 21, 2018 judgment's findings set forth on pages 1 and 2 and numbered 1 through 10 are affirmed, except for the findings numbered 3, 7 and 9.

The finding numbered 3 is modified to begin:  "Defendant Alta Sierra Holistic Exchange is organized as a California nonprofit mutual benefit corporation and did business .…"

The finding numbered 7 is modified to read in full:  "A public nuisance is found to have existed on the Property due to Defendants' violations of G-8630 and Chapter 5.86

---

*        See footnote, *ante*, page 1.

of the KCOC, which violations occurred prior to June 27, 2017. The evidence presented does not prove that there is a realistic prospect that Defendants intend to engage in the unlicensed operation of a cannabis dispensary or other cannabis-related activity prohibited by Kern County Ordinance Code."

The finding numbered 9 is modified to read in full: "Civil Code section 3479 et seq., also entitled Plaintiffs to seek to enjoin and abate the public nuisance that existed on the Property." As modified, the findings numbered 3, 7 and 9 are affirmed.

As to the decrees and orders set forth in the May 21, 2018 judgment, paragraph No. 1 on page 3 of the judgment is modified to read in full: "The medical marijuana dispensary operated at the Property after May 10, 2016, and prior to June 27, 2017, is declared to have been a public nuisance."

Paragraph Nos. 2 through 5 on pages 3 and 4 of the judgment are reversed, and the matter of the first cause of action is remanded to the trial court with directions to enter a judgment denying County's request for a permanent injunction.

Paragraph Nos. 6 and 7 on page 4 of the judgment addressing costs, attorney fees and the prevailing party issue are vacated, and the matter of costs and attorney fees is remanded with directions to reconsider the prevailing party issue.

Defendants shall recover 50 percent of their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5) & (c).)

_____

FRANSON, Acting P.J.

WE CONCUR:


_____

PEÑA, J.


_____

SMITH, J.

43.